GRANGER et al. v. PROVIDENCE–WASHINGTON INS. CO.

(Circuit Court of Appeals, Second Circuit. November 11, 1912.)

No. 50.

1. INSURANCE (§ 272*)—MARINE INSURANCE—EFFECT OF UNDERSTATEMENT OF CARGO IN BILL OF LADING.

It is not a defense to an action on a marine policy to recover the value of a portion of a lumber cargo jettisoned that the measurement of the cargo, correctly given in the policy, was understated in the bill of lading because of a custom of the shipper, in case of dressed lumber, to allow for the reduction in bulk by reason of the dressing, where the insurer

is protected from any increased risk from overloading by a warranty of seaworthiness in the policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 572–582; Dec. Dig. § 272.*]

2. INSURANCE (§ 272*)—MARINE INSURANCE—ACTION ON POLICY—DEFENSES.

Whether or not such practice of shippers, if general, or, in the particular case, if known to insurers, would influence them in accepting or rejecting a risk, is not a matter for expert testimony, since it is not a question of general usage, but one to be determined in each case by the particular underwriter; and a policy, otherwise legal, cannot be invalidated after a loss because the insurer was not advised of the fact.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 572–582; Dec. Dig. § 272.*]

Appeal from the District Court of the United States for the Southern District of New York; Learned Hand, Judge.

Suit in admiralty by Harvey Granger and Charles E. Lewis against the Providence-Washington Insurance Company. Decree for respondent, and libelants appeal. Reversed.

For opinion below, see 192 Fed. 674.

Hyland & Zabriskie, of New York City, for appellants.

Harrington, Bigham & Englar, of New York City (D. Roger Englar, of New York City, of counsel), for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

WARD, Circuit Judge. Libelants chartered the schooner Wellfleet to carry from Savannah to Norfolk "a full and complete cargo under and on deck of dressed yellow pine paving block material and to pay to said party of the first part or agent for the use of said vessel during the voyage aforesaid 14c. per tie of standard cross-tie of 7 by 9 inches 8½ feet long (44⅝ superficial feet) for each and every tie delivered and pro rata for smaller or larger ties if same are shipped." It seems strange to calculate the freight upon dressed paving block material as if it were shipped as cross-ties.

After the schooner was loaded the libelants presented the bill of lading to the master, acknowledging the shipment of "483,807 superficial feet equal to 10,842 pieces of 7x9 8 feet 6 inches standard cross-ties." They had previously insured the cargo with the defendant, describing it as 518,807 feet, which was the actual superficial measurement of the dressed lumber for which the consignee paid. The libelants explain the discrepancy between the bill of lading and the policy amount by saying that standard cross-ties are rough, so that the schooner would have less capacity for them than she would have for dressed lumber, and, the freight being payable on the basis of standard cross-ties, a deduction should be made for freight purposes from the actual measurement of the dressed lumber. Such a deduction is frequently included in charter parties, as may be seen from some of the reported cases. Bowen v. Sizer (D. C.) 93 Fed. 227; Randolph v. Wiley (D. C.) 118 Fed. 77; Peterson v. Cedar Logs (D. C.) 127 Fed. 868.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In the course of her voyage the vessel encountered heavy weather and jettisoned some 38,000 feet of the deck load, bringing the rest of the cargo in safety to destination. The libelants are suing upon the policy for the loss of this lumber.

[1] The court below dismissed the libel, on the ground that the libelants admitted that it had been their practice to understate the footage of dressed lumber for freight purposes by deducting so much of the footage as the vessel carried in excess of the footage of rough lumber which she could have carried. He held that this practice was a fact material to the risk, which the libelants were bound to disclose to the underwriters. He also suggested that in a suit against the vessel or her owners, or in general average proceedings, the cargo owners, and therefore the underwriters subrogated to their rights, might be estopped from showing the real amount of the deck cargo because of this understatement in the bill of lading. In respect to the amount of the shipment, the bill of lading is always open to explanation between the parties, and even if an estoppel could be created in the way supposed against the charterers, the vessel owners being in no way injured, it could not exist in this case, because the cargo owners paid and the vessel accepted freight on the full measurement of the dressed lumber.

The practice, whether right or wrong, in our opinion was not material to the actual risk. There was a warranty implied by law, as well as expressed in the policy, that the schooner was seaworthy when she began her voyage, so that no disclosure of this practice was necessary, if in point of fact it would cause unseaworthiness. The circumstance that in the course of the voyage it became necessary to jettison a part of the deck load does not of itself prove unseaworthiness. It constantly happens that seaworthy vessels have to sacrifice equipment or cargo to save the common adventure. This is especially true in the case of deck loads, because they are easily disposed of, and the deck is not, in the absence of contract or of a custom of the trade, a proper place for cargo. In this particular case all the parties contemplated a deck cargo. If the excess of the cargo actually loaded over the amount stated in the bill of lading made the schooner unseaworthy, then the underwriters, because of the warranty of the seaworthiness, are discharged, whether the charterer made the statement honestly or not, and whether the master did or did not know the fact. The burden of proving unseaworthiness when the vessel began her voyage rests on the underwriters, and we find no satisfactory proof of it in the record. The master, indeed, testifies that she was unseaworthy because she was overloaded; but we think he must have been satisfied from her draft that she was not overloaded. It is quite incredible that he should determine the question by comparing the number of feet stated in the bill of lading with the number of feet stated in the bills of lading on former voyages. The number of feet that the vessel can carry depends, among other things, upon the length and shape of the lumber and upon its greenness or dryness. He should have known whether his vessel was overloaded, even if the bill of lading did not state the amount of the cargo at all.

As we hold that this practice of the libelants' was not material to the actual risk in this case, there is left as the only inquiry whether it was material to what is known as the moral risk. In other words, whether reasonable underwriters, if advised of it, would refuse to insure the libelants in a case where the practice was not followed, or where, if followed, it was not material to the actual risk.

[2] The court below permitted insurance experts to say whether underwriters, if advised, first, of this general practice of the insured, would be influenced in accepting or rejecting the risk, or, second, of the practice in this particular case only, whether they would be so influenced. We think this is not a question which requires special knowledge or training to answer, and that there can be no general usage upon such a point. It must depend in every case upon the views of the particular underwriters. It seems to us to be going quite too far to hold that underwriters may be discharged of their liability for a claim in every respect regular, because they were not informed by the insured that he had often been guilty of fraudulent practices, or was in the particular case guilty of a fraud upon the owners of the vessel, which in no respect affected the actual risk. Some underwriters might be unwilling to insure the property of a dishonest man, or of a liar, or of a drunkard; but it would be unreasonable to relieve an underwriter of liability for a perfectly regular claim on the ground that the insured should have informed him that he was dishonest, untruthful, or intemperate.

The decree is reversed.