### BELLA S. S. CO. v. INSURANCE CO. OF NORTH AMERICA.

(District Court, D. Maryland. May 23, 1923.)

1. **Insurance ⊙⟶272—False representations held to avoid policy.**

Statements made by brokers for shipowners in an application for a valued policy of insurance, based on a valuation greatly exceeding the actual value of the vessel, that she was engaged on a profitable charter, which was in process of being renewed for another year, and in answer to further inquiry that she was earning 6 per cent. on an investment of $500,000, *held* materially false representations, which avoided the policy, on evidence showing that she had been operated for a year past at a loss and that her value was less than one-fourth the amount of the insurance.

2. **Insurance ⊙⟶256(2)—Representations made by broker in application for insurance binding on owner.**

That materially false representations on which a policy on a ship was issued were made by brokers acting for the owners, and not by the owners themselves, or the fact that the owners may not have actually known the representations to be false, *held* not to change their effect to avoid the policy, where they were of matters of which the owners should and could have known.

⊙⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

At Law. Action by the Bella Steamship Company against the Insurance Company of North America. Judgment for defendant.

This is an action at law, brought in the United States District Court for the District of Maryland by the Bella Steamship Company against the Insurance Company of North America as one of the underwriters on a valued policy of insurance issued by the American Marine Insurance Syndicates on the steamship Bella. On December 23, 1921, the Bella Steamship Company, through its insurance brokers, Messrs. Johnson & Higgins, applied by letter to the defendant for insurance on the Bella from February 1, 1922, to February 1, 1923, on an agreed valuation of $286,000 on hull, additional insurance of $110,000 to be obtained on disbursements and profits. The assured stated in the letter that the Bella was operating in the fruit trade between Baltimore and Jamaica under a profitable charter, which was already in progress of renewal. On December 27, 1921, the defendant stated by telephone to the assured's brokers that the valuation asked was out of line with what other owners were asking, and inquired why so high a valuation was desired. The brokers replied that they had been informed by the assured that the Bella was returning it an income of 6 per cent. on an investment of $500,000. The defendant then accepted the risk and issued the policy.

An expert ship valuer called by the plaintiff estimated the actual market value of the Bella at the times the insurance attached and she later sank at $55 per deadweight ton. The defendant's expert valued her at $50 per deadweight ton. The vessel's deadweight tonnage was 1,170. Hence, on the plaintiff's evidence, the actual market value was only $64,350. The manager of the steamship company testified, when first cross-examined, that as a result of the Bella's operation the company owed on December 31, 1921, the same debts it owed on January 1, 1921, and in addition owed $45,000 for repairs made in 1921. On being again called by the plaintiff, he testified that he did not know whether the Bella made a profit or a loss as a result of her operation in 1921. He also testified that the company kept no books of account, except a bank book and a check stub book, with canceled checks. A compilation of these by plaintiff's counsel showed an income from the charter during 1921 of $154,000, and operating expenses of $130,668.25. Other expenses disclosed of $48,000 were alleged not to be operating expenses. The plaintiff also introduced evidence to show that the company, which owned and operated only this vessel, owed at the end of 1921 $20,000 more for repairs than it owed at the end of 1920, and that during 1921 the Bella was off hire under the charter for periods entitling the charterer to a deduction of $4,400. On this evidence the defendant asked for an instructed verdict, on the ground that the policy was void, because the assured had misrepresented the value of the Bella in applying for the insurance. The court granted this request and charged the jury as hereinafter set forth.

The evidence also showed the following facts: On June 14, 1922, the Bella classed Lloyds A1, sailed light from Baltimore to Jamaica. She encountered fine weather on the voyage. About midnight of June 17 water was discovered in her No. 3 hold by an oiler, who was examining the gland and shaft bearings. This man felt water dripping on his head. He reported the presence of water in No. 3 hold to the engineer on watch, and then went into No. 3 hold, where he saw that the water was about on a level with the top of the shaft tunnel. Prompt examination by the ship's officers and crew failed to disclose the source of the entrance of the water. Although the pumps were alleged to have been put on the hold, the water continued to gain at the rate of about two feet an hour, and the vessel continued to sink gradually by the stern. At 3:30 a. m. it was alleged that the pressure of the water in No. 3 hold caused the bulkhead between the hold and the engine room to give way. The captain testified that he then gave an order to abandon the ship. The crew got into lifeboats and rowed off a short distance, and stood by until 4:25 a. m., when the Bella sank. They were all picked up at 4:30 a. m. by the revenue cutter Tamaroa, which the Bella had overtaken and passed during the previous afternoon, and whose lights had been visible to the Bella

since nightfall. The plaintiff offered no explanation as to the cause of the sinking.

The defendant called as witnesses experts who testified that the period of time from midnight until the Bella sank was about the same period which would be required to fill No. 3 hold sufficiently to cause the vessel to sink by deliberately opening her various sea connections for the purpose of scuttling the ship. The defendant also called as witness a former master of the Bella, who testified that at various times persons purporting to represent the Bella Steamship Company had offered him $6,000 to scuttle her before the insurance ran out. His testimony was materially corroborated by the testimony of two other former officers of the Bella. The defendant also called as witness a resident of Baltimore, who testified that he was a creditor of one of the officers of the steamship company, and that, on being pressed for payment before the Bella sank, this officer said that he expected soon to receive part of the insurance money on the Bella, and would then pay the debt.

On this evidence the defendant moved that the court also instruct the jury that as the plaintiff had offered no explanation of the sinking, and as the only reasonable explanation was that shown by the defendant's evidence, namely, scuttling, a verdict should be returned for the defendant. The charge of the court to the jury on both aspects of the case is given below in full.

Bartlett, Poe & Claggett, Edgar Allan Poe, Niles, Wolff, Barton & Morrow, Emory H. Niles, Edwin H. Bromley, and John Henry Skeen, all of Baltimore, Md., for plaintiff.

Bigham, Englar & Jones, T. Catesby Jones, James W. Ryan, all of New York City, and Janney, Ober, Slingluff & Williams, Stuart Janney, and R. W. Williams, all of Baltimore, Md., for defendant.

SOPER, District Judge (directing verdict). Gentlemen of the jury, it is perhaps desirable that I say a word in explanation to you of the conclusion which the court has reached in this case, particularly as you have very patiently borne the burden of the case. You, of course, know that the suit is one on a policy of marine insurance, and that two defenses have been offered by the defendant. The first defense is that the vessel was scuttled. As I understand the authorities, there is evidence in this case legally sufficient to leave that matter to your determination, if it were the only thing in the case; that is to say, there is evidence upon which you might, in your discretion, find that the vessel was sunk from some peril of the sea. It is true, of course, that the precise cause of the sinking of the vessel is not clear from the testimony. It, indeed, remains a mystery, according to the evidence, even to the owners and crew of the vessel; but that question would be submitted to you, if there were nothing else in the case. On the other hand, there is evidence legally sufficient upon which it would be possible for you to find that the vessel was sunk by the crew of the vessel with the knowledge or connivance of the management. As to whether or not the vessel was so sunk, it is not my duty to express an opinion, and I think it would be highly improper for me to do so either one way or the other.

[1] There is, however, a second defense in this case, namely, that the policy was issued after certain false representations had been made by the owner to the insurance company. The legal question there involved is set out in the defendant's second prayer, which it is my duty and obligation either to grant or to refuse, and so upon that matter I am obliged, as I see the law and the facts of this case, to ex-

press an opinion. This prayer, which, after careful consideration I have concluded it is my duty to grant, is as follows:

"The defendant prays the court to instruct the jury that, it appearing by the uncontradicted evidence in this case that the policy sued on was issued by the defendant as the result of false representations material to the risk made to the defendant by the plaintiff, or on its behalf, the verdict of the jury must be for the defendant."

Now the undisputed evidence in this case is that, when the question of issuing this policy was under consideration and before it was issued, the matter of the value of the steamship Bella was under specific consideration by the insurance company. When the brokers who represented the owner made application for the insurance which accompanied the letter of December 23, 1921, they stated in that letter:

"The vessel is engaged on a profitable charter in the fruit trade between the West Indies and the United States ports, principally Baltimore, and arrangements are already in progress for the renewal of the charter for another year."

When the American Marine Insurance Syndicate received that letter, they were struck by the amount of insurance that was requested, the value of the vessel being $65,000 or $66,000. The insurance applied for was to be based on a valuation of $286,000. The underwriters, therefore, inquired why it was that so much insurance was requested and asked as to the value of the vessel. The conversation took place on December 27 between the agent of the underwriters and the agent of the owner, and it was stated to the underwriters that the vessel was deriving an income of approximately 6 per cent. on an investment of some $500,000, or an income, which must have been understood to be a net income, of $30,000 a year. That estimate, of course, could be based only on the year 1921, during which the vessel was being operated. Now, if this representation were true, it furnished a perfectly sensible reason why the owner desired insurance so much in excess of the market value of the vessel, because it would appear that, whatever the market value of the vessel was, it had a real substantial value in excess of the market value to the owner. If, on the other hand, the vessel was not being profitably operated, and if the representation then made was not true, but, on the contrary, was false, the underwriters were undertaking something in addition to the risk contemplated in the policy. They risked not only the loss of the vessel for the causes specified in the policy, but the additional risk that she might be destroyed in order to collect the insurance.

I have carefully considered and read the testimony which has been taken, and had the benefit of extended and careful arguments by counsel on both sides on this point. In my opinion the uncontradicted evidence shows that the representation that was made before the policy was issued was a false representation; it was not a correct statement of the facts as they existed at the time the representations were made, or at the time the policy was issued. When Mr. Gardner, who had the management of the vessel, was first on the stand, he testified clearly that the vessel did not make any money during 1921, and upon

being pressed further he stated that, as a matter of fact, it operated under a loss. That was the state of the testimony when the legal question now under discussion was first considered by the court and counsel in a session which was held for some three hours last Friday night. There was a considerable discussion as to the various figures that had been mentioned here, and what I am now expressing was then expressed in the presence of counsel; that it seemed to me that the effect of the testimony was that a false representation had been made. I further stated, however, that Mr. Gardner's statements were somewhat general, and were not supported by the detailed figures, which were or ought to be in his possession, viz. the records which constituted such books of account as were kept, and that it seemed a pity, after so much time had been taken up in this case, a case which might go to a higher court and might be followed by other similar cases on other policies, that all of the information in the possession of the owners should not be presented to the court.

Following that suggestion, the plaintiffs have attempted to produce the information suggested, and that attempt was made yesterday in your presence by Mr. Gardner and Mr. Carozza and the other witnesses who were here. They have produced the check stubs, bank book, canceled checks, and the receipted bills. There was some difficulty and embarrassment to the plaintiff by reason of the ruling of the court that the receipted bills were not evidence which ought to be considered. That embarrassment was more apparent than real, for the reason that the plaintiff was able to put in all of the figures, or substantially all of them, which he would have been able to produce had the bills been admitted, and in passing on this question I have considered that the summary of the receipts and disbursements prepared by counsel for the plaintiff has been fully proved, just as if the bills were in. In other words, what counsel for the plaintiff tried to do was this: They took all of the disbursements as shown by the check book of the Bella Steamship Company, which amounted to the sum of $178,000, and then they endeavored to show that a large number of items included in those disbursements were not properly there, because they were not expenses of the Bella, but constituted diversions—I do not mean improper diversions—but diversions of the funds of the Bella from the purposes of the steamship business to other purposes, such as cash to Mr. Carozza, the substantial owner of the company, and cash paid to other persons which did not represent expenses incurred by the Bella in her operation.

In coming to this conclusion I have considered that they have fully proved, though they have not in every detail, but I have considered that they have fully proved, that all of the deductions from the disbursements, which they claim, should in fact be made. They amount to some $48,000, leaving a sum total of disbursements of $130,668.25. Now the sum total of money which they could receive, if they were given credit for all the payments received from the charterer and all the amounts which under any circumstances could have accrued from the charter, amounted to $154,000; that is, 11 months at the rate specified in the charter of $14,000 a month. That left the net sum of

$22,334.75 as a result of the 11 months' operation. If they did not owe anything at the end of the year, that was the net result.

Now, it has been brought out by the testimony of the plaintiff itself that, in addition to the expenditures which they actually made, they were obligated at the end of the year to the extent of $20,000 for repairs which were begun on or about December 20th of that year, repairs made necessary by the operation of the vessel in 1921, and that they were also obliged to deduct from the charter amount—that is, the payments under the charter—the additional sum of at least $4,400 for off hire for periods during which the vessel could not be used, but was laid up for repairs of one kind or another. Those two amounts, without any more, reach $24,000 approximately, and wiped out entirely the difference between the receipts and disbursements as disclosed by the formal statement submitted by counsel for the plaintiff. It therefore appears, gentlemen, that instead of this vessel engaging in a profitable charter and earning $30,000 during the year 1921, she was actually operated at a loss. She certainly made no money.

Therefore I have come to the conclusion, upon the undisputed evidence of the plaintiff itself, that this statement which was made by the plaintiff's brokers in applying for the insurance was a false statement, and, as I have come to the further conclusion that such a statement is material to the risk, the result is that this policy is void. It is not necessary, gentlemen of the jury, for the court to conclude that these statements were made with an intent to deceive or defraud the insurance company. The result was the same in either case. The insurance company was allowed to accept a risk which it is fair to believe they would not have accepted had they known the facts.

Now, it is urged by counsel for plaintiff that the court ought not to take into consideration the cost of repairing the vessel represented by Obrecht's bill of $20,000, which was incurred the latter part of December, 1921; that it should not take into consideration the allowance made necessary to the charterer for the off hire of $4,400 during the same period, since the amount of these expenses was not definitely ascertained when the brokers made their statement to the underwriters. But I think that that position is incorrect. It was perfectly apparent to the owners of this vessel, if they cared at all to look into the matter, that actually the vessel had lost money during 1921, and had not made any money. This was apparent to them, or should have been apparent to them, before the policy was issued. They knew before the policy was issued, or could have known by a fair examination of their record, that the statement which they had made, or which had been made on their behalf, to the insurance company, was a false statement.

[2] It is also urged on the part of the plaintiff that the brokers went further with the insurance company than they were justified in going in the statement which they made. In my opinion that is not a material matter in this case. The brokers represented the owners, and the owners were responsible for any representations made when this policy was issued. But I think it is fair to add that what Mr. Gardner and Mr. Carozza did tell their brokers was ill-considered to say the

least. They made an estimate that this vessel could operate during 1922 for $90,000 a year. The only way they could estimate that amount was by ascertaining what they had done during 1921. Mr. Gardner testified on the stand yesterday that at no time did he make an estimate as to whether the Bella had made or lost money in 1921. Consequently his statement which he admits that he made, or Mr. Carozza made, that the boat would make some $30,000, or thereabouts, during 1922, was reckless, to say the least, and was not based upon any examination, because no examination was ever made. And it is not surprising, therefore, that the brokers made the statement to the insurance company which they did make.

I have endeavored to go into this matter with as much care as I was able to give, because I realize the importance of this case to all the parties, and also the great amount of time which you, gentlemen of the jury, have been obliged to give to it. The particular point under consideration, however, could not be finally decided until the last of the testimony was taken yesterday afternoon and considering it as a whole I feel that it is my duty to grant this second prayer of the defendant.