**BTESH et al. v. ROYAL INS. CO., LIMITED, OF LIVERPOOL.**

**No. 386.**

Circuit Court of Appeals, Second Circuit.

May 11, 1931.

Burlingham, Veeder, Feary, Clark & Hupper, ·of New York City (Ray Rood Allen and Norman M. Barron, both of New York City, of counsel), for libelants-appellants.

Mortimer L. Shuford, of New York City (Joseph A. Fagnant, of New York City, of counsel), for respondent-appellant.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Btesh & Company held an "open" policy of insurance issued by the respondent covering marine shipments made by them for their own account, or for the account of others who should so order in writing before the steamer sailed. ·One, Cherem, a merchant in Mexico City, bought in New York two parcels of silk from a New York merchant, another of cottons from Btesh, and a third of cotton napkins from a third person. He had the silk merchant ·make four wooden cases, pack the silks in two of these, and send them with the two empty cases to Btesh. Btesh then filled the two empty cases with the cottons, and sent the four to a steamer of the Ward Line at New York for shipment to Mexico City via Vera Cruz. The cases were marked in such a way as not to disclose their contents, but the dock receipts and the bills of lading, prepared by Btesh, stated the contents of all four to be "cotton piece goods." Cherem then executed at the Mexican consulate in New York a consular invoice in five parts which recited that the cases contained "fancy dress goods", and sent the part retained by him with the bills of lading to his consignee in Mexico City, who procured entry at Vera Cruz of one case of silk and one of cotton. The other two were lost while in the custody of the carrier; nobody could account for their disappearance,

and both sides assume that they were stolen en route.

Meanwhile Btesh & Company upon a written, but unsigned, order of Cherem had procured certificates under the open policy covering the four cases from their store in New York to Mexico City, and correctly describing their contents. When Btesh demanded payment of the Ward Line for the lost cases, his claim was rejected because "not presented in accordance with the bill of lading." Having thus failed, he then made claim against the respondent under the certificates of insurance, which refused and defended on the ground that the bills of lading and the consular invoices had fraudulently misdescribed the goods.

The evidence showed that the Ward Line usually, if not always, gave greater care to silk shipments when so declared in the bill of lading, than to ordinary cargo. Silk was put upon a "special list," and, while the testimony is not entirely satisfactory, it sufficiently appears that in ordinary course the special list received extra care. This was not the practice of all carriers, some of which, e. g., the White Star and United Fruit Lines, made no difference in the custody of "special" and general cargo, unless the value was declared and extra freight paid. Moreover, the libellant called an underwriter of experience, who said that to mark the cases as silk would have increased the risk en route from Vera Cruz to Mexico City, where substantially all thefts occurred, and that the misdescription was therefore a positive advantage to the insurer.

The judge held that the libellant was bound to disclose to the respondent the way in which the goods were billed, that the risk was thereby affected on the case of silk, and that as to it the libel failed. He held the respondent for the cotton, because, though Cherem had been engaged in a fraud on the consul, it was immaterial to the risk on that case. Both parties appealed.

The assured under a marine policy must disclose to the underwriter all circumstances known to him which materially affect the risk. McLanahan v. Universal Insurance Co., 1 Pet. 170, 187, 188, 7 L. Ed. 98; Sun Mutual Ins. Co. v. Ocean Ins. Co., 107 U. S. 485, 509, 510, 1 S. Ct. 582, 27 L. Ed. 337; St. Paul F. & M. I. Co. v. Balfour, 168 F. 212, 217 (C. C. A. 9); Muller v. Globe & R. Ins. Co., 246 F. 759, 761 (C. C. A. 2). Just what is material the decisions do not, and in the nature of things cannot, exactly define, except to say that it must be something which would have controlled the underwriter's decision. By this we understand only what a reasonable person in the assured's position would suppose. In Granger v. Providence-Washington Ins. Co., 200 F. 730, we held that a practice of the assured's to compute the amount of the cargo upon a false basis, was not material, since it did not expose the property to added peril on the voyage. On the other hand it is plain that if for example the ship be known to be unseaworthy, or the goods ill stowed, the underwriter's hazard is substantially increased.

In the case at bar it seems to us plain that, had Cherem or Btesh known the practice of the Ward Line to give more care to silk shipments than to cotton, his duty would have been clear to disclose how he had entered them upon the bills of lading. Cherem's excuse, which the libellant tried to fortify by the evidence of the underwriter, that the fraud was an effort to protect the silk by giving it a disguise, is a feeble subterfuge. More might be said for it, if the markings on the cases had been false, but the bills of lading were not likely to pass into the hands of those who would steal the goods. Substantially the whole risk of theft was between Vera Cruz and Mexico City and they did not cover this part of the carriage. It is true that they were sent to the consignee at Mexico City, who presented them, as we assume he was obliged to present them, at Vera Cruz with the consular invoice. At that place they would indeed get some publicity, and it is conceivable that this might expose them to subsequent danger. However, this is a far-fetched explanation for a trick more naturally explained otherwise. Cherem got a lower freight rate on cottons than on silk, and paid a smaller consular fee for fancy dress goods. The judge apparently believed that he merely wished to filch a little from the Ward Line and the consul, and we see no reason to differ from his conclusion.

It is not necessary that the assured should intend a fraud upon the underwriter; his duty is positive to disclose. It cannot of course require him to tell what he does not know, Neptune Ins. Co. v. Robinson, 11 Gill. & J. (Md.) 256, and indeed the books are somewhat vague as to how far he shall be charged at his peril with appreciating the materiality of what he does know, Mayne v. Walter [1782] 1 Park, Ins. 431; Brownlie v. Campbell, L. R., 5 App. Cas. 925, 954;

722

Joel v. Law Union, etc., Ins. Co., L. R. [1908] 2 K. B. 863, 884; Smith v. Ins. Co., 17 Pa. 253, 261, 55 Am. Dec. 546; Curry v. Com. Ins. Co., 10 Pick. (Mass.) 535, 538, 542, 20 Am. Dec. 547; 3 Joyce § 1848; 1 Arnould § 575. The last is not here involved, because if Cherem knew of the Ward Line's practice there could be no doubt that it substantially affected the hazard. It is not shown that he did, though he might well have inferred as much. The statute (section 181, title 46, U. S. C. [46 USCA § 181]) exonerated the carrier, certainly as such, from liability if the silk was not declared, and the liability might well involve added care. Besides, valuable goods are more subject to theft than others, and though the liability was limited, the carrier would be likely to employ more precautions for their protection.

■ Be that as it may, it does not appear to us that an assured who engages in a fraud against the carrier is in a position to protest that he did not suppose that it would hurt any one else. He takes his chances as to how far his wrong may go, and if in fact it exposes his goods to a greater peril than if he had been honest, he becomes responsible to his underwriter as well as to the carrier. It is not anomalous so to impose a larger duty because of conscious- wrongdoing; the law often does so, as for example in the case of deliberate aggression. When a man has violated the primary duty of honest dealing, while he does not indeed become an outlaw, there is no reason to treat him tenderly, or to excuse him because he was aiming at some one else. Here we think that he became charged as between himself and the respondent with whatever were in fact the consequences of his fraud, and that the judge was right in denying recovery for the silk.

■ As to the cotton we think him also right. The authenticity of Cherem's written order was perhaps open to doubt, but it is a matter that we will not reopen. The fraud upon the carrier in respect of the silk had no sensible effect upon the risk as to the cotton; it was of no moment that Cherem had shown himself in general untrustworthy. Granger v. Providence-Washington Ins. Co., supra. If insurers would excuse themselves because of the moral obliquity of those with whom they deal, they must write it in their policies. Otherwise it is enough that they are not exposed to unassumed risks directly touching the property insured.

Decree affirmed.