## WATHEN et al. v. PUBLIC FIRE INS. CO.

### No. 37.

Circuit Court of Appeals, Second Circuit.

Dec. 5, 1932.

Foley & Martin, of New York City (W. J. Martin, of New York City, and David Stoffer, of Newark, N. J., of counsel), for appellant.

Bigham, Englar, Jones & Houston, of New York City (George S. Brengle and John M. Aherne, both of New York City, of counsel), for appellees.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The plaintiffs, owners of the barge Lottie, seek to recover from the defendant, an insurance company, for loss of the Lottie, which foundered on September 19, 1928, when at anchor in the Delaware breakwater. The trial court directed a verdict for the plaintiffs, and the defendant has appealed.

The tug T. J. Hooker started from Hampton Roads, on September 16, 1928, having in tow plaintiffs' barges Nahant, Olwine, and Lottie, loaded with coal for New England ports. When the tow was off Atlantic City, the wind shifted to the northeast and raised such a heavy sea that the tug turned around and headed back into the Delaware breakwater, arriving there at about 7 p. m. on September 18th. During that night the wind increased. During the morning of September 19th, the Lottie began to leak and hoisted signals of distress. She was an-

chored to the southwest of the other barges and farther away from the breakwater so that she was more exposed to the pounding of the waves. Not long after noon on September 19th, she sank just after the tug had taken off her crew. The other two barges rode out the storm successfully.

Robert B. Wathen, the managing director of the plaintiff, had for some time attempted to insure the Lottie, but was unable to obtain a rate that he was willing to pay. On the evening of September 18th he received a message from the owner of the tug T. J. Hooper that she was taking her tow into the breakwater to seek shelter. Upon obtaining this information, he proceeded from Baltimore to New York, and on arriving there directed his brokers to place insurance on the Lottie and three other barges (not among those in the tow), provided it could be obtained at a rate of 5 per cent., a rate somewhat lower than he had been able to obtain. The broker asked him where his boats were, and he replied: "Thank God they are safe in port." The broker offered the risk to Throckmorton, the marine underwriter of the Public Fire Insurance Company, who inquired, "Where are the boats?" and was given the answer, "They are in port." Throckmorton thereupon said, "I will accept your line at five per cent.," and issued a binder for a time policy of $14,000 hull insurance covering the Lottie for one year. The three other barges were also covered at $10,000 each. The insurance was of the hull equipment and machinery "in port and at sea" within the navigation limits of Eastport, Me., and Norfolk, Va.

At the time the binder was issued, Throckmorton knew that there was a considerable storm coming up the Atlantic Coast, but was not aware of the whereabouts of the insured vessels. Within about an hour after the binder attached, the Lottie became a total loss, and thereafter this action was brought by her owners to recover the insurance. The following defenses of misrepresentation and concealment by the insured of facts material to the risk were interposed:

(1) That the plaintiffs' broker obtained the insurance upon a representation that the Lottie was "safe in port" when she was in fact on a voyage from Norfolk to New London and a violent storm was sweeping the Atlantic Coast.

(2) That the broker had made this representation in answer to a specific question by the defendant's marine underwriter regarding the whereabouts of the Lottie.

(3) That the broker, when applying for the policy, had concealed from the defendant that the Lottie was on a voyage through a storm center.

We think that the reply of the plaintiffs' insurance broker to Throckmorton's question, "Where are the boats?" was a misrepresentation of a material fact. The object of Throckmorton in asking the question was to learn whether they were in a safe place. He testified that "it is very unusual to accept a hull risk in the middle of a voyage." Fol. 234. The answer, "They are in port," did not give a true account of the situation of the Lottie. At that time the Lottie was, practically speaking, "on a voyage," only interrupted by her temporary asylum behind the Delaware breakwater, and was not in a "port" in any commercial sense. The word "port" to the ordinary person means a place where cargo can be loaded and discharged. As Lord Halsbury said in Hunter v. Northern Marine Ins. Co., 13 A. C. at page 723: "It is a place of safety for the ship and the goods, whilst the goods are being loaded and unloaded. There will never be a port, in the ordinary business sense of the word, unless there is some element of safety in it for the ship and goods. * * *" See, also, Devato v. Eight Hundred and Twenty-Three Barrels of Plumbago (D. C.) 20 F. 510, at page 515. We think that the word "port" was used here in the ordinary business sense, and did not include a mere partial shelter in the lee of a breakwater inaccessible to any wharf or pier or harbor facilities.

It is argued that the place where the Lottie was anchored was a "Port of Refuge." It is designated on the government chart as "Harbor of Refuge," and many vessels lay there at the very time when the binder was issued, and, so far as the record shows, rode out the storm in safety. But, whether or not the place was in some limited sense a "port," it was not one in the commercial sense intended, and was not an adequate place of refuge for the Lottie as events proved. She was a barge having a registered depth of only 13.3 feet. At page 82 of part V of the United States Coast Pilot (4th Ed.) we find this significant warning: "Small vessels of less than 12 feet draft will find better shelter from easterly and northerly winds if anchored in Delaware Breakwater Harbor which lies a little over 1 mile southwestward from the Harbor of Refuge." The chart in evidence shows that Delaware Breakwater Harbor is protected by an inner break-

water, and is adjacent to the village of Lewes, where there are docks (fol. 214), obviously a place of much greater safety than the so-called "Harbor of Refuge" and perhaps a real port in the commercial sense. Lewes was five or six miles from the place where the Lottie was anchored. Fol. 545.

We do not suggest nor do we believe that any fraud was intended by plaintiffs or their broker in the application for the policy, but we hold that in stating that the Lottie was "in port" there was a misrepresentation sufficient to avoid the policy. Btesh v. Royal Ins. Co., Ltd., of Liverpool (C. C. A.) 49 F.(2d) 720; King v. Aetna Ins. Co. (C. C. A.) 54 F.(2d) 253; Moses v. Delaware Ins. Co., 17 Fed. Cas. page 891, No. 9872; Carrollton Furniture Mfg. Co. v. American Credit Indem. Co. (C. C. A.) 115 F. 77, at page 79; Kerr v. Union Marine Ins. Co. (C. C. A.) 130 F. 415, at page 417; Snare & Triest Co. v. St. Paul Fire & Marine Ins. Co. (C. C. A.) 258 F. 425, at page 427; Bella S. S. Co. v. Insurance Co. of N. Am. (D. C.) 290 F. 992; Anderson v. Pacific Fire & Marine Insurance Co., L. R. 7 C. P. at page 68; Arnould on Marine Ins., 11th Ed. § 535.

It is evident from the foregoing that the plaintiffs established no case upon which a verdict could properly have been directed. On the contrary, the motion by the defendant for a direction should have been granted because of the misrepresentation.

The judgment is reversed, and a new trial ordered.