PURITAN INSURANCE COMPANY, American Druggists Insurance Company, Utah Home Fire Insurance Company and Assurances Generales de France, Plaintiffs-Appellants,

v.

EAGLE STEAMSHIP COMPANY S.A., Earle Shipping Company, Ltd., Myrapal Freighters Corp., Duchess Shipping Company, Ltd., Lyras Shipping, Ltd. and Thomas E. Leeds Company, Inc., Defendants-Appellees.

No. 85–7320.

United States Court of Appeals, Second Circuit.

Argued Aug. 26, 1985.

Decided Dec. 18, 1985.

John M. Speyer, New York City (Margaret M. O'Neill, Speyer, Thurm, Perlberg & Heller, New York City, on brief), for plaintiffs-appellants.

Robert P. Lewis, New York City (Allan J. Graf, Irene Savidis, Hill, Betts & Nash, New York City, on brief), for defendants-appellees Eagle Steamship Co. S.A., Earle Shipping Co., Ltd., Duchess Shipping Co., Ltd., and Lyras Shipping, Ltd.

Philip J. Walsh, New York City (Richard P. Byrne, Eric M. Kornblau, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, on brief), for defendant-appellee Thomas E. Leeds Co., Inc.

Before FEINBERG, Chief Judge, and KEARSE and CARDAMONE, Circuit Judges.

KEARSE, Circuit Judge:

The plaintiff insurance underwriters Puritan Insurance Company, *et al.* (the "insurers"), appeal from a final judgment of the United States District Court for the Southern District of New York, entered after a bench trial before Kevin Thomas Duffy, *Judge*, dismissing their action for damages and a declaration that certain insurance written by plaintiffs was void on account of defendants' nondisclosures of material facts in their application for insurance coverage. The district court dismissed the complaint on the ground that plaintiffs had failed to prove that they would not have issued the policy had all the material facts been accurately disclosed. The court also awarded attorney's fees to defendants. On appeal, plaintiffs principally challenge the trial court's findings of fact and contend that there was no valid basis for the award of attorney's fees. We affirm the dismissal of the complaint, but we remand the matter of attorney's fees to the district court for further proceedings.

## I. BACKGROUND

Defendants Eagle Steamship Company S.A., Earle Shipping Company, Ltd., and Duchess Shipping Company, Ltd. (collectively the "ship owners" or "owners"), were the owners of several ships, including the IRINIO and the MARIAM, upon which they obtained hull and machine insurance from plaintiff insurers for the year beginning July 9, 1980. Defendant Lyras Shipping, Ltd., was the managing agent for the owners from March 1979 through the period in question. Defendant Thomas E. Leeds Company, Inc. ("Leeds"), was an insurance broker used by the owners to obtain insurance. Plaintiff insurers conducted business, at least in part, through a corporation called American National General Agencies of New York, Inc. ("ANGA"), which they authorized to accept risks and write insurance on their behalf. Most of the events leading to the present controversy are not substantially in dispute.

### A. *The Application*

In late April 1980, the ship owners, acting through their operating agent, asked Leeds to seek renewed insurance for the four vessels for the year 1980–1981. The owners provided Leeds with a list of losses suffered by the vessels during the 1979–1980 policy year. These losses were shown in the application submitted by Leeds to ANGA and other insurance underwriters in June 1980; the application stated that in the policy year 1979–1980, premiums paid had exceeded losses claimed to the extent that the owners had a credit balance of 7.5%. The list of losses that was submitted with the application, however, omitted any mention of two casualties that had occurred within that period. The first accident, in the late summer of 1979, had resulted in main engine damage to the MARIAM for which the then-insurers eventually paid $638,115. The second accident involved the IRINIO in March 1980, and the repairs, which had been commenced prior to the owners' April 1980 communications to Leeds with regard to new insurance, resulted in payments by the then-insurers in the amount of $422,487.

Following Leeds's dissemination of the application, a syndicate at Lloyd's of London agreed to act as lead underwriter

("Lloyd's" or "leaders"), and it set certain premium rates. ANGA's senior vice president Derek Jones and its employee William J. Hatzel reviewed the application on behalf of plaintiffs and noted the low 7.5% credit ratio. Jones concluded that notwithstanding the fact that the proposition appeared to be marginal, plaintiffs would underwrite 5% of the risk. On July 1, 1980, ANGA orally bound this amount with Leeds on behalf of the plaintiff insurers, effective July 9, 1980, and accepted the rates set by Lloyd's.

### B. *The Disclosure of the IRINIO Loss*

By letter dated July 2, 1980, and received by Leeds on July 7, the owners informed Leeds for the first time of the March 1980 loss to the IRINIO, which they then estimated would total more than $300,000. Leeds employee Mary Mase immediately gave this information to the British insurance brokers, who relayed it to Lloyd's. Lloyd's agreed not to take the March 1980 loss to the IRINIO into account in the renewal. Mase testified that she then telephoned ANGA and spoke either to Hatzel or to ANGA senior marine underwriter Paul Gagliardi. Mase testified that she informed the person to whom she spoke of the fact of the IRINIO loss, although probably not of its amount, and of the fact that Lloyd's had decided not to take the IRINIO loss into account for the renewal. Gagliardi and Hatzel denied having received such a call from Mase.

On July 22, Leeds sent a written binder ("Binder") to ANGA and the other underwriters who had agreed orally to underwrite the risk. The July 22 Binder was to supersede the application of June 6. Under a section entitled "Information to Underwriters," the Binder stated: "As per leaders agreement 'IRINIO' Machinery Damage Claim March 1980 not taken into account this renewal." The "Statistics" section of the July 22 Binder continued to list a 7.5% credit balance. Because of the new information on the IRINIO loss, ANGA had the option of not signing the Binder and could have declined the risk had it been aware of the situation. Both Gagliardi and

Hatzel testified that they had read this Binder but that they did not recall seeing its reference to the IRINIO loss. Jones testified that ANGA would not have accepted the risk if it had known of the additional losses to the IRINIO and the MARIAM. On July 30, Gagliardi signed the Binder on behalf of the plaintiff insurers without asking anyone at Leeds about the IRINIO loss.

### C. *The Disclosure of the MARIAM Loss*

Leeds first learned of the 1979 loss of $638,000 to the MARIAM on January 5, 1981, and it listed this loss and the $422,000 loss to the IRINIO in the renewal application it sent ANGA on June 10, 1981. The application also listed losses totaling nearly $3 million for the 1980–1981 policy year to these two ships and to one other insured by plaintiffs and owned by the ship owners. Gagliardi testified that, in reviewing the renewal application, he noticed the losses to the IRINIO and the MARIAM that had not been included in the previous year's application. These losses brought the supposed 7.5% credit balance for that year to a deficit of more than 300%.

### D. *The Decision Below*

Plaintiffs refused to pay claims under the 1980–1981 policy and filed this lawsuit in August 1981, seeking damages and a declaratory judgment that the policy was void *ab initio*, on the ground that they had undertaken the risk in reliance on materially inaccurate representations contained in the June 6, 1980 application. The ship owners counterclaimed for plaintiffs' unpaid share of the losses covered under the policy, plus prejudgment interest, and sought an award of attorney's fees.

Following a four-day bench trial, the district court issued an opinion and order dismissing plaintiffs' complaint, granting the owners' counterclaim, and awarding attorney's fees to all defendants. It found as established the sequence of events described above. The court noted the differing statements of Mase, Hatzel, and Gagliardi with respect to telephonic notification of ANGA by Leeds of the IRINIO loss in July 1980. The court explicitly found

credible Mase's testimony that she had called ANGA and informed one of those two employees of the fact of the IRINIO loss, and it accepted that testimony as true. The court found incredible the testimony of Gagliardi and Hatzel that in reading the July 22 Binder they had overlooked the information as to the IRINIO loss.

The court noted the principle that the parties to a maritime insurance contract are held to the highest degree of good faith and that the failure of the assured to disclose a material fact or circumstance known to him makes the policy voidable at the instance of the insurer. The court found that the fact of the IRINIO loss was disclosed to ANGA prior to its signing of the Binder, and it concluded that the insurers had not established that the facts not disclosed to them prior to ANGA's signing of the Binder were material. Thus, the court stated that although the initial application should have disclosed the losses to the IRINIO and the MARIAM, defendants had satisfied their obligation with respect to the IRINIO by amending the application in July 1980; it ruled that, while the ship owners should also have disclosed the loss to the MARIAM, the plaintiffs had failed to prove that they would not have undertaken the risk had they been fully informed of this loss. The court found that, in deciding to accept 5% of the risk on the ship owners' application, plaintiffs had apparently relied on the judgment of the lead underwriters rather than on the information presented in defendants' application.

Having found that the plaintiffs failed to prove that the nondisclosures were material, the court dismissed the complaint and granted the ship owners' counterclaim for nonpayment by plaintiffs of their share of the losses covered by the policy. The court awarded defendants their attorney's fees incurred in connection with the litigation, stating that New York law authorizes such an award where the insurer sues the insured to avoid policy obligations.

## II. DISCUSSION

On appeal, the insurers contend principally (1) that the trial court erred in finding that there was sufficient disclosure of the loss to the IRINIO, that plaintiffs did not prove reliance on the nondisclosures, and that the nondisclosures were not material, and (2) that there was no sound legal basis for the award of attorney's fees. While we find no clear error in the trial court's findings as to the merits of plaintiffs' claims, and thus affirm the dismissal of the complaint, we agree that the award of fees must be set aside and remanded for further consideration under appropriate legal standards.

### A. The Merits

It is well established that the parties to a marine insurance contract are held to the highest degree of good faith. Under this obligation, called *uberrimae fidei*, the party seeking insurance is required to disclose all circumstances known to him which materially affect the risk. *Btesh v. Royal Ins. Co., Ltd., of Liverpool*, 49 F.2d 720, 721 (2d Cir.1931). If he acquires material information after having applied for insurance, he is required to communicate that information to the proposed insurer:

> The underwriter must be presumed to act upon the belief, that the party procuring insurance, is not, at the time, in possession of any facts, material to the risk, which he does not disclose; and that no known loss had occurred, which, by reasonable diligence, might have been communicated to him.... [W]here a party orders insurance, and afterwards receives intelligence material to the risk, or has knowledge of a loss[,] he ought to communicate it to the agent, as soon as, with due and reasonable diligence, it can be communicated, for the purpose of countermanding the order, or laying the circumstances before the underwriter. If he omits so to do, and by due and reasonable diligence, the information might have been communicated, so as to have countermanded the insurance, the policy is void.

*Thebes Shipping, Inc. v. Assicurazioni Ausonia SPA*, 599 F.Supp. 405, 426 (S.D.N.Y.1984) (quoting *McClanahan v. Universal*

*Insurance Co.,* 26 U.S. (1 Pet.) 170, 185, 7 L.Ed. 98 (1828) (Story, *J.*)).

■ The principle of *uberrimae fidei* does not require the voiding of the contract unless the undisclosed facts were material and relied upon. A fact is not material unless it is "something which would have controlled the underwriter's decision," *Btesh v. Royal Ins. Co.,* 49 F.2d at 721, and a marine insurance policy "cannot be voided for misrepresentation where the alleged misrepresentation was not relied upon and did not in any way mislead the insurer." *Rose and Lucy, Inc. v. Resolute Insurance Co.,* 249 F.Supp. 991, 992 (D.Mass.1965). Further, "[a] minute disclosure of every material circumstance is not required. The assured complies with the rule if he discloses sufficient to call the attention of the underwriter in such a way that, if the latter desires further information, he can ask for it." 2 M. Mustill & J. Gilman, *Arnould's Law of Marine Insurance and Average* § 646, at 493 (16th ed. 1981).

The trial court made its findings within this legal framework, and the insurers do not contend otherwise. Rather, they contend that the court "misapplied" the law. In essence the insurers contend that the trial court erred in finding that (1) the amount of the loss to the IRINIO was not material because the disclosure that was made was sufficient to alert ANGA to inquire if knowing the amount of the loss was important to it and ANGA did not so inquire, and (2) the insurers did not rely on the omission of information as to the loss to the MARIAM. We are unpersuaded that reversible error has occurred.

■ Our task on appeal is to determine whether the trial court has applied the proper legal principles and whether its findings of fact are "clearly erroneous." If those findings are not "clearly erroneous," they may not be disturbed, Fed.R.Civ.P. 52(a); *Pullman-Standard v. Swint,* 456 U.S. 273, 290, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982). In determining whether findings are clearly erroneous we are required to give considerable deference to the trial court's assessments of the credibility

of the witnesses and to its determination as to which of competing inferences should be drawn from the evidence of record. *See Anderson v. City of Bessemer City, N.C.,* — U.S. ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985); *Wainwright v. Witt,* — U.S. ——, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985). Thus, "[w]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson v. City of Bessemer City, N.C.,* 105 S.Ct. at 1513. And "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 1512. Within this framework, the trial court's findings in the present case are not clearly erroneous.

■ The court found that the insurers had not established that they relied on defendants' failure to provide information as to the size of the loss to the IRINIO or the failure to disclose the fact of loss to the MARIAM. Although the insurers challenge this finding on the ground that the testimony of the ANGA employees that they relied on defendants' omissions was "uncontradicted," there was no requirement that the district court believe the testimony of these employees, and it plainly did not credit that testimony. Rather, it chose to credit the testimony of Mase that she telephoned ANGA and informed either Hatzel or Gagliardi of the IRINIO loss. It thus chose to disbelieve the testimony of these ANGA employees that neither had received such a call, as well as their testimony that they did not read the written disclosure of the IRINIO loss made in the July 22 Binder. The court's thus implicit finding that ANGA had been alerted to the specially disclosed fact of the IRINIO loss but had chosen not to seek further information as to its amount supports the court's refusal to credit the testimony that ANGA would have declined the risk had it known the amount of the IRINIO loss. The court

also refused to credit the testimony·that ANGA would have declined the risk had it known about the MARIAM loss, based in part on its inference that the plaintiff insurers were more likely than not merely following the leaders in matters relating to this risk. This was a permissible inference given the assessment that the ANGA witnesses' testimony as to their knowledge of the IRINIO loss was not credible and the facts that ANGA had made no independent investigation into the risk initially, had made no inquiry upon being informed of the IRINIO loss and the leaders' agreement not to take it into account, and had not sought to set their own premium rates but had accepted those set by Lloyd's.

We see no basis in the record for disturbing the trial court's assessment of the various witnesses' credibility or for concluding that its view of the inferences to be drawn from the evidence is clearly mistaken. Accordingly, we find no error in the court's conclusion that plaintiffs failed to carry their burden of proving that the nondisclosures were material and that they relied on them, and we affirm the dismissal of the complaint.

B. *The Award of Attorney's Fees*

 Upon dismissing the complaint and upholding the owners' counterclaim, the trial court awarded defendants attorney's fees on the theory that New York law allows such an award when the insurer has unsuccessfully sued the insured to avoid policy obligations, citing *Mighty Midgets, Inc. v. Centennial Insurance Co.*, 47 N.Y.2d 12, 416 N.Y.S.2d 559, 389 N.E.2d 1080 (1979). We have two difficulties with the court's reliance on *Mighty Midgets*.

First, although the plaintiffs' complaint invoked the district court's diversity jurisdiction, it also properly invoked the court's admiralty jurisdiction. *See Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310, 313, 75 S.Ct. 368, 370, 99 L.Ed. 337 (1955). In such circumstances, the court should consider whether federal admiralty law, rather than state law, should be applied to a given issue. *See Kossick v.*

*United Fruit Co.*, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); *see also Crosson v. N.V. Stoomvaart Mij "Nederland,"* 409 F.2d 865, 868 (2d Cir.1969). We see no indication that the court considered whether federal admiralty law or other principles of federal law should govern the availability of an award of attorney's fees.

Second, it is not clear that New York law, even if applicable to the fees issue in admiralty cases in general, permits an award of fees on the facts of the present case. The insurance policy here obligated the insurers only to indemnify the ship owners against loss for damage to the ships' hulls and machinery; it did not obligate them to defend litigation against the owners. Although the *Mighty Midgets* court stated that an award of fees against the insurer is available when the insured is "cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations," 47 N.Y.2d at 21, 416 N.Y.S.2d at 564, 389 N.E.2d at 1085, both *Mighty Midgets* and the cases it cited in support of this proposition dealt with insurance contracts that obligated the insurer to defend as well as to indemnify the insured against loss. *See Johnson v. General Mutual Insurance Co.*, 24 N.Y.2d 42, 49–50, 298 N.Y.S.2d 937, 942, 246 N.E.2d 713, 717 (1969) (insured entitled to recover expenses of defending declaratory judgment action brought as a result of insurer's breach of obligation to defend tort action); *Glens Falls Insurance Co. v. United States Fire Insurance Co.*, 41 A.D.2d 869, 870, 342 N.Y.S.2d 624, 627 (3d Dep't 1973) (mem.) (same), *aff'd on opinion below*, 34 N.Y.2d 778, 358 N.Y. S.2d 773, 315 N.E.2d 813 (1974) (mem.). "Essentially, [these] cases find support in the theory that an insurer's *responsibility to defend* reaches the defense of any actions arising out of the occurrence." *Mighty Midgets*, 47 N.Y.2d at 21, 416 N.Y. S.2d at 564, 389 N.E.2d at 1085 (emphasis added; emphasis in original deleted). Since the insurers here had no responsibility to defend, the *Mighty Midgets* principle does

not reach the circumstances of the present case.

The defendants contend that the award of attorney's fees was nonetheless appropriate under the court's equity powers or under Fed.R.Civ.P. 11. Although the general American rule is that "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser," *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975), an exception allows an award of such fees "when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons,'" *id.* at 258–59, 95 S.Ct. at 1622 (quoting *F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)). Rule 11, as amended in August 1983, makes somewhat similar provision for the imposition of sanctions when a pleading has been signed in bad faith; the prior version of Rule 11 allowed sanctions for "subjective" bad faith. *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 253 (2d Cir.1985). In order to support an award of attorney's fees on grounds of bad faith, "there must be 'clear evidence' that the claims are 'entirely without color *and* made for reasons of harassment or delay or for other improper purposes.'" *Id.* (quoting *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1088 (2d Cir.1977)) (emphasis in *Eastway*).

The trial court did not make findings sufficient to support an award of fees under either the bad faith exception or Rule 11. *See, e.g., Sierra Club v. United States Army Corps of Engineers*, 776 F.2d 383, 390 (2d Cir.1985). While it appears that a distinction in this case could be drawn between Leeds and the ship owners in terms of the strength of the grounds for the insurers' suit, we of course express no view as to whether an award in favor of either would be proper.

We remand the matter of attorney's fees to the district court for further consideration in light of the appropriate legal principles. On remand, the district court should determine whether there is a settled federal admiralty rule—or whether there should be a uniform federal rule—involving the award of attorney's fees in situations such as this one. If so, the court should apply the federal rule; if not, the court should apply pertinent principles of New York law.

## III. CONCLUSION

The judgment of the district court is affirmed insofar as it dismissed the complaint and granted the defendant ship owners' counterclaim. We vacate the judgment insofar as it awards attorney's fees, and remand the matter for further proceedings not inconsistent with this opinion.

CARDAMONE, Circuit Judge, dissenting:

After learning from Mase and from the July 22, 1980 binder about the IRINIO loss, none of ANGA's employees made further inquiry. Based solely on this the district court found ANGA to be a "de facto" follower of the lead underwriter in all matters relating to this risk. Once ANGA is labelled a follower, the majority finds that no omissions or misrepresentations in the original June 6, 1980 application for insurance, including the $638,115 loss to the MARIAM, were relied upon by ANGA and hence could not be classified as material. Because I believe that the district court's finding of ANGA to be a "de facto" follower was clearly erroneous and that the decision today ignores the continuing strong viability of the *uberrimae fidei* doctrine in marine insurance cases, I respectfully dissent.

Not until June 15, 1981—more than a year after Leeds submitted its original insurance application—was ANGA made aware of the correct 1979–80 loss record, including the dollar amount of the IRINIO loss and the substantial loss to the MARIAM. The credibility finding that Mase alerted either Hatzel or Gagliardi (ANGA's employees) to the IRINIO loss in July, 1980, but not as to its amount is not disputed. One of the two named employees

was also made aware simply of the fact of the IRINIO loss in the written binder sent to ANGA on July 22, 1980. But, the owners and Leeds knew then that the loss would total at least $300,000. Yet, they did not disclose this amount in any conversation with or information sent to ANGA in July. International's[1] President knew in April, 1980 that the MARIAM loss would total at least $370,000, but this loss also was not disclosed to Leeds until January 5, 1981 and not disclosed to ANGA for five more months.

When this transaction is viewed in perspective, two things become clear. ANGA made no independent investigation into the risk initially, nor did it make further inquiry into the dollar amount of the IRINIO loss when alerted to its existence. The owners and Leeds made a game out of their duty of disclosure. Playing each card as close to their vests as possible, the defendants initially submitted an original application containing several misrepresentations and omissions. When correcting these prior omissions the defendants released as little information as possible. In addition, they failed to disclose the substantial loss to the MARIAM, of which they were fully aware.

On balance, upholding the district court in this case will allow those seeking marine insurance to present incomplete information initially and to repeat the process when correcting prior misinformation. Once some disclosure is made—even if intentionally incomplete—the majority rules that the insurer must forage on its own for more information or risk being found *not* to have relied on any omissions or inaccuracies contained in the applicant's disclosures.

Such a rule seems to me impractical and unworkable. Rather, in this case the doctrine of *uberrimae fidei* should apply. That doctrine obligates the assured to volunteer all information which might have a bearing on the scope of the risk assumed, and the failure to do so allows the insurer

to void the policy. *Contractors Realty v. Ins. Co. of North America,* 469 F.Supp. 1287, 1294 (S.D.N.Y.1979). The insured is bound to communicate all material information regardless of whether any inquiry was made concerning it. *Gulfstream Cargo, Ltd. v. Reliance Insurance Company,* 409 F.2d 974, 980–81 (5th Cir.1969). Once the policy of insurance is procured the duty of disclosure continues and after-discovered information must be promptly and fully communicated. *See Thebes Shipping, Inc. v. Assicurazion; Ausonia SPA,* 599 F.Supp. 405, 426 (S.D.N.Y.1984).

Here, no serious doubt can exist that appellees should have disclosed on June 6, 1980 the losses to the IRINIO and the MARIAM. As to the IRINIO loss, some argument may be made that ANGA could not continue to ignore the IRINIO loss, once it was made aware of its existence. Concededly, an underwriter's absolute right to demand disclosure of material facts may be waived by its neglect to investigate certain facts when a basis for inquiry is raised by the information communicated. *See Gulfstream Cargo, Ltd. v. Reliance Insurance Company,* 409 F.2d at 982. But this does not mean that an applicant for marine insurance can knowingly disclose incomplete information—in breach of its duty of complete good faith and full disclosure—hoping that the insurer will not investigate further into the amount or circumstances of a particular loss. The duty of full disclosure, especially a disclosure to correct prior misrepresentations, falls on the insured. To shift that burden in the name of non-materiality merely contradicts the strict duty of utmost good faith that underlies marine insurance. While a minute disclosure of every material circumstance is not required, 2 M. Mustill & J. Gilman, *Arnould's Law of Marine Insurance and Average,* § 646 at 493 (16th ed. 1981), the amount of a particular substantial loss or the fact of another loss can hardly be classified as "minute."

---

**1.** International Ship Management, Inc., not joined as a defendant in this litigation, was the managing agent for the owners in the United States.

Even assuming that ANGA waived its right to sue on the IRINIO loss, no disclosure was made to it of the MARIAM loss. Any waiver as to the IRINIO loss cannot constitute a waiver of *all* material omissions, on a theory that ANGA simply was ignoring all disclosures. ANGA should be entitled to void this contract solely because of the nondisclosure of the MARIAM loss. A party cannot waive rights to something about which it knows nothing, and while only scant notice of the IRINIO loss was given, absolutely *no* notice of the loss to the MARIAM was supplied.

The only proof that ANGA elected to follow the lead underwriter with regard to all decisions regarding the risks is that derived from an inference, that is to say, ANGA did not itself make a thorough investigation of the risks involved. From this the majority therefore concludes that ANGA must be a follower. Ranged against this ambivalent inference was not only testimony from ANGA's employees that ANGA was not a follower, but several even stronger inferences that lead to the conclusion that ANGA was not a follower. First, unlike at least one other underwriter in this transaction, plaintiff did not agree to be bound by the lead underwriter's determinations. Second, defendants freely admit that ANGA could have rescinded its obligation when the July 22, 1980 binder was sent. If ANGA was a follower of the lead underwriter, it would have had to relinquish all rights of rescission. Absent agreement to be bound by the lead underwriter and with a conceded right to rescind, ANGA was not a follower and a contrary finding is clearly erroneous as a matter of fact.

That is not the end of the matter. As a matter of law ANGA was entitled to rely on the doctrine of *uberrimae fidei*. Rather than concluding that ANGA was a follower because it did not make a thorough investigation of the risks involved, it seems more logical to believe that the doctrine of *uberrimae fidei*—intended to relieve insurers from many usual duties of investigation—was relied upon by ANGA. Thus, its failure to investigate on the basis of incom-

plete information should not constitute a waiver; it merely indicates that an insurer elects to take advantage of a favorable rule of law.

Finally, without expressly dealing with the question, the majority appears to have indirectly reduced the effect of the doctrine of *uberrimae fidei*. If such is the aim of the majority it deserves discussion. Because I believe the doctrine has continued vitality, and for the other reasons stated, I vote to reverse and to declare that ANGA is not liable on the risk.