**Frederick W.A. KNIGHT, Plaintiff,**

v.

**U.S. FIRE INSURANCE COMPANY, Insurance Company of North America, Centennial Insurance Company, Reliance Insurance Company, Federal Insurance Company, Royal Insurance Company of America, Northwestern National Insurance Company, Highlands Insurance Company and Continental Insurance Company, Defendants.**

No. 83 Civ. 5102 (CBM).

United States District Court,
S.D. New York.

Feb. 10, 1986.

Haight, Gardner, Poor & Havens by Gordon W. Paulsen, Robert S. Burrick, New York City, for plaintiff.

Waesche, Sheinbaum & O'Regan, P.C. by Donald M. Waesche, New York City, for defendants.

MOTLEY, Chief Judge.

## OPINION

In late 1982 plaintiff Frederick Knight obtained a policy of insurance worth over thirty million dollars for a collection of Thai statuary which he was planning to ship from Singapore to Piraeus, Greece. After the vessel sank in transit, plaintiff attempted to collect on the insurance but was refused by defendants herein, the policy's underwriters. Defendants claim they were entitled to void the insurance *ab initio*, and have done so, because of plaintiff's alleged material non-disclosures and misrepresentations. Plaintiff, accordingly, commenced this law suit.

Defendants have now moved for summary judgment on the grounds that no material fact exists as to their right to have cancelled plaintiff's policy and that, therefore, plaintiff may not collect under it. For the reasons that follow, defendants' motion is granted and this case dismissed.

## FACTS

Plaintiff is a citizen of Holland who had moved to Bangkok, Thailand in the 1970's and who continues to reside there. Between 1976 and 1979 plaintiff obtained 222 antique stone and bronze statues of Buddhas and fable gods for an aggregate price of approximately $65,000. In 1980 an appraiser in Bangkok, hired by plaintiff, placed a value of $20,205,000 on the statuary. The next year, in April 1981, this same appraiser revised his estimate for the collection to $27,000,000, and then later that year, in the beginning of September, to $30,307,500. Meanwhile, at some time between 1980 and summer 1981, the 222 pieces of sculpture were shipped in various lots from Bangkok to Singapore.

Claiming that he was planning to sell the Buddhas and fable gods to a European collector, in February 1981 plaintiff contacted the London brokerage firm of Hogg Robinson to arrange for insurance. He requested coverage of $20,205,000 to insure the collection during a sea shipment from Singapore to The Netherlands. The insurance was successfully placed on the Lon-

don market. In May of 1981, pursuant to the increased valuation of his Bangkok appraiser, plaintiff requested and obtained through Hogg Robinson an additional $10,000,000 coverage for the voyage.

All did not proceed smoothly, however. In June of 1981, Mr. Robert Jensen, plaintiff's broker at Hogg Robinson, received two anonymous phone messages from callers who said they had a score to settle with plaintiff. Knight, they informed the broker, was about to perpetrate a fraud with his shipment of Buddhas and fable gods. Jensen conveyed this information to the lead London underwriters of plaintiff's policy who, in turn, expeditiously ordered an independent appraisal of the statues which were still awaiting shipment in Singapore. A few days later, plaintiff received a telex from Jensen in London. It informed him that the London underwriters had voided his policy, having concluded that plaintiff was guilty of material non-disclosures and misrepresentations in his insurance application. The telex from Jensen further relayed to plaintiff the underwriters' opinion that the statues were "grossly over-valued," "and in some, if not all cases, replicas," the evidence having suggested that the "proper value of the consignment [was] nominal only (possibly approximately 1 pct of the value declared)."

About a year passed before any additional events relevant to this law suit occurred. In spring of 1982, plaintiff made a completely new attempt to obtain insurance for his shipment of Buddhas and fable gods from Asia to Europe. This time he approached a New York brokerage firm, H.E. Yerkes & Associates ["Yerkes & Associates"] which successfully placed the over thirty million dollar risk with several American insurance companies, the defendants in the present suit. This first New York policy was for a voyage from Singapore to Marseilles, and thence to Paris, where a prospective buyer for the collection, allegedly interested in it to the tune of thirty million dollars, wished it sent. When the collection was not shipped from Singapore within the time period of the coverage, this first New York policy was cancelled.

Plaintiff received a letter at this time from a Mr. Howland Keller, a vice president of Yerkes & Associates, detailing the background of this initial cancellation resulting from the delay in shipment date. In this May 1982 letter Keller also reiterated the "underwriting position" of one of the main underwriters, INA [Insurance Company of North America]. "Please understand," Keller wrote,

"that the risk as originally presented to INA was that of a sold shipment, i.e., a completed sale, conditional only upon the buyer's approval when it arrived in Paris. *The value was established by an appraisal and by a letter from the buyer (we have copies of both* )." (emphasis added).

The appraisal referred to was that of plaintiff's expert in Bangkok. The "letter from the buyer," a certain Egyptian living in Alexandria, stated that he was interested in purchasing the entire collection for a sum not exceeding thirty million dollars.

A few months later, in October of 1982, plaintiff made a second application to his New York broker for voyage insurance to cover the 222 Buddhas and fable gods. By a telex dated October 17, plaintiff informed Yerkes & Associates that he had found a wealthy Greek shipowner by the name of George Papalios who was interested in the collection and was prepared to negotiate for its purchase at a price of around thirty million dollars. Accordingly, plaintiff wished to reinstate insurance for a voyage from Singapore to Europe, but this time with a Piraeus, Greece destination.

Plaintiff's telex also represented that storage and guards at a bonded warehouse in Piraeus had been arranged, and that $30,000,000 in fire and theft insurance for the port to warehouse transit in Greece had been obtained. Furthermore, continued the telex message, as to the voyage itself, plaintiff's agent in Greece was arranging for the hire of a first class vessel from Singapore to Piraeus with a captain who would be willing to supervise loading and stowage of the antiques.

Shortly thereafter, Yerkes & Associates successfully placed a new risk of $30,630,-750 for this projected voyage with the defendant insurance companies. This group was substantially the same as that which had insured the projected Singapore to Marseilles voyage earlier in the year. Although these underwriters were apprised of plaintiff's October 17 telex detailing the proposed voyage to Greece, none was informed that the London insurance market had previously voided a policy with plaintiff for shipment of the same 222 Buddhas and fable gods for the reasons stated above. Moreover, with the possible exception of INA, one of the main underwriters, none of these American underwriters had been apprised of plaintiff's approximately $65,000 initial purchase price for the collection or of the fact that under Thai law antiquities of such value could only have been smuggled illegally from that country.

Finally, in January 1983, a container said to contain plaintiff's collection of 222 bronze and stone Buddhas and fable gods was loaded on board the Aliakmon Runner at the port of Singapore for carriage to Piraeus, Greece. The ship set sail from Singapore roughly as scheduled. However, on or about February 7, 1983, the Aliakmon Runner sank deep in the Indian Ocean.

## DISCUSSION

Defendant claims that summary judgment based on its asserted right to void plaintiff's insurance policy should be granted on the basis of plaintiff's alleged material non-disclosures and misrepresentations as enumerated below. At the outset, it must be noted that under established principles of maritime law, see *infra*, any one of these alleged nondisclosures or misrepresentations, if in fact they occurred and were material, clearly would have justified defendants in voiding plaintiff's thirty million dollar policy on the Buddhas and fable gods.

The material non-disclosures charged by defendants are as follows: 1) the low price plaintiff originally paid for the statuary in the jungles of Thailand, approximately $65,000 only a few years earlier; 2) the

fact that if the multi-million dollar value that plaintiff had represented was accurate, the objects' previous exportation from Thailand would have been illegal; and 3) the fact that earlier in 1982, London underwriters had cancelled a similar insurance policy on the same 222 Buddhas and fable gods, notifying plaintiff that according to their independent appraisals the objects were grossly overvalued and appeared to be replicas rather than genuine specimens.

Defendant also charges that plaintiff made actual material misrepresentations regarding the insured goods. These alleged misrepresentations are all contained in the October 17, 1982 telex sent by plaintiff to his broker in New York and consist of the following statements by plaintiff: 1) that there was an interested buyer in Greece whose price for the art objects would be in the area of thirty million dollars; 2) that bonded storage in Piraeus had been arranged; 3) that fire and theft insurance had been arranged; and 4) that plaintiff's agent in Greece was actively making arrangements for shipment of the objects from Singapore to Greece on a first class vessel.

## The Standard for Summary Judgment

The standard for granting a summary judgment motion under Fed.R.Civ.P. 56(c) is a difficult one to satisfy. Summary judgment may be granted only if there exists no genuine issue as to any material fact in the case and if upon such indisputable facts, the moving party is entitled to judgment as a matter of law. See *Battery Steamship Corp. v. Refineria Panama, S.A.,* 513 F.2d 735, 738 (2d Cir.1975). Even where the parties are in accord as to the actuality of the relevant circumstances, a dispute of material fact so as to preclude summary judgment may exist if divergent and legally significant inferences can be drawn from these agreed upon factual circumstances. This is because such an inferential function belongs to the trier of fact alone. See *Katz v. Goodyear Tire and Rubber Co.,* 737 F.2d 238 (2nd Cir.1984).

■ It is obvious from the documents submitted thus far in this action, and even without fully considering the applicable law, that there is a disputed issue of material fact with regard to at least two of plaintiff's alleged misrepresentations. First, as to plaintiff's telexed statement that it had located an interested party in Greece in the thirty million dollar price range, plaintiff in his depositions concedes that this information was erroneous. However, plaintiff asserts, when he subsequently discovered that the buyer was interested only in the amount of three million dollars, he quickly informed his American agent by telephone. This agent in turn, and again by phone, quickly reported back to plaintiff in Singapore that INA, one of the main underwriters, had been apprised of this correction as to the Greek's purchase price and had given assurances that this change was immaterial to them.

■ Plaintiff's account surely has something of an incredible air about it. Nonetheless, whether the telexed information regarding a Greek buyer constituted a misrepresentation justifying avoidance of the policy, or whether instead it was a clerical error, subsequently corrected and communicated, remains a disputed issue of fact not properly determined in a summary judgment motion. Similarly, and even more clearly a matter of factual dispute in this case is the misrepresentational status of plaintiff's telexed assertion regarding the vigor of his Greek agent's efforts to arrange for a first class vessel for the passage from Singapore to Piraeus.

The other nondisclosures and misrepresentations by plaintiff that defendants argue justified their avoidance *ab initio* of plaintiff's policy, are essentially uncontested by both parties and are not quite so simply dismissed. As to these—plaintiff's misrepresentations regarding his preparations for bonded storage and fire and theft insurance in Greece, as well as plaintiff's non-disclosure of information regarding the statuary's initial purchase price, the circumstances of its export from Thailand, and the fact that a similar policy had been voided by London underwriters—a closer look at the law of maritime insurance is required to determine whether any factual dispute yet lingers.

### The doctrine of uberrimaie fidei

■ Under traditional and still vital principles of admiralty law, it is "well established that the parties to a marine insurance contract are held to the highest degree of good faith." *Puritan Insurance Co. v. Eagle Steamship Co.,* 779 F.2d 866, 870 (2d Cir.1985). This obligation, which goes by the name of *uberrimaie fidei,* requires the party seeking insurance to disclose all circumstances known to him which materially affect the risk. Id. See also *Btesh v. Royal Ins. Co., Ltd. of Liverpool,* 49 F.2d 720, 721 (2d Cir.1931) (Hand, L., J.). This high standard requires, moreover, that the assured communicate all material information regardless of whether any inquiry was made concerning it. *Gulfstream Cargo, Ltd. v. Reliance Insurance Co.,* 409 F.2d 974, 980–81 (5th Cir.1969); *Contractors Realty v. Ins. Co. of North America,* 469 F.Supp. 1287, 1294 (S.D.N.Y.1979). Departure on the part of the assured from the stringent disclosure obligations of this *uberrimae fidei* doctrine entitles the insurer to cancel the policy *ab initio.* See *Puritan Insurance Co. v. Eagle Steamship Co.,* 779 F.2d 866, 871 (2d Cir.1985).

The question of whether a non-disclosure or a misrepresentation is material, however, so as to entitle an underwriter to void the policy is a matter of fact. Materiality in this context depends on whether the information is "something which would have controlled the underwriter's decision" to take on the risk. *Puritan Insurance Co. v. Eagle Steamship Co.,* supra at 871, quoting *Btesh v. Royal Ins. Co.,* 49 F.2d 720, 721 (2d Cir.1931). See also *Btesh v. Royal Ins. Co.,* supra, at 721 (elaborating that "something which would have controlled the underwriter's decision," must be understood as an objective standard, i.e., to mean "material" for a reasonable person in the *assured's* position). It is the problematic answer to this factual question—the question as to the materiality as thus de-

fined of plaintiff's remaining and conceded misrepresentations and non-disclosures— that this court concludes removes all but one of these misrepresentations and non-disclosures as an available ground for summary judgment in favor of defendants on this motion.

■ First of all, the materiality to defendants of plaintiff's initial purchase price for the 222 Buddhas and fable gods seems at least questionable. True, there is a remarkable discrepancy between the $65,000 said to have been paid for the entire collection and its ultimate appraisal. It must be remembered, however, that the statues were allegedly bought in a war torn, third world country—a context where bonanzas (to use the kindest term) in the purchase of antiquities and national treasures are not beyond the realm of probability. Moreover, it seems at least conceivable that the phenomenon of vast fluctuation and speculation in the contemporary art market would also render the relatively low initial purchase price a fact of not much consequence to the subsequent insurers. Clearly, on this issue, much remains to be weighed by the trier of fact.

■ Secondly, the materiality of the historical fact that plaintiff may have illegally smuggled the antiquities from Thailand to Singapore seems even more dubious. Defendants were insuring the goods on a voyage from Singapore to Greece and there is little indication even in their own depositions that prior violations of Thai export regulations would affect the risk of such a voyage.

At this point it is relevant to comment on the statements made by defendants' representatives during the course of proceedings in this case to the effect that plaintiff's initial purchase price and a history of smuggling would have been material to the decision to grant plaintiff an insurance policy. For purposes of a summary judgment motion these assertions are of little interest. Defendants' own *post facto* assertions of materiality, especially in this context where their self-serving nature should be obvious (defendants have thirty million dol-

lars to lose if plaintiff's policy remains in effect) are clearly subject to credibility determinations by the trier of fact. See *Puritan Insurance Co. v. Eagle Steamship Co.*, 779 F.2d 866, 871–872 (2d Cir.1985).

■ The two conceded misrepresentations in plaintiff's October 1982 telex— those regarding his bonded storage arrangements and his fire and theft insurance arrangements in Piraeus—involve similarly crucial and factually unresolved questions of materiality. It simply cannot be said, from the evidence thus far presented or as a matter of law, that these two facts would have controlled defendants' decision to take on Knight's thirty million dollar risk. Thus, they too furnish defendants with no basis for success in their summary judgment motion.

■ Ample grounds for this court to grant summary judgment in defendants' favor exist, however, in the remaining conceded non-disclosure. There can be no question that the voidance a few months earlier of plaintiff's prior London insurance policy for approximately thirty million dollars on the same collection of Buddhas and fable gods would have been a material, i.e., controlling, factor in defendants' decision to accept the risk. Just as indisputable, it would have been material and controlling to any reasonable person in the underwriters' position.

Plaintiff has argued that the London underwriters were unjustified in their cancellation of the earlier 1981 policy and thus there was no need to disclose this prior voidance to subsequent insurers. It was unjustified, explains plaintiff, because it was rooted in two anonymous telephone calls impugning plaintiff's integrity and also because the independent appraisal relied upon by these London underwriters had been done by an allegedly unqualified appraiser. These allegations are irrelevant. The undisputed fact remains that in July 1981 plaintiff received a telex in Singapore from his London broker informing him that the underwriters had cancelled their coverage. The telex explicitly in-

formed him of the reasons offered by the underwriters in coming to this decision, i.e., their determination upon independent inspection that the statuary was "grossly overvalued" and consisted largely of "replicas."

It seems obvious to this court that as a matter of indisputable fact a prior underwriter's voidance of a thirty million dollar insurance policy on antiquities of dubious origin on the grounds that the goods were "grossly over-valued" and inauthentic would have been material to any subsequent underwriter's decision to accept the risk. See *King v. Aetna Ins. Co.*, 54 F.2d 253, 254 (2d Cir.1931) (Swan, J.) (while ordinarily the materiality of nondisclosure in a marine insurance context is a fact for the jury, in a case where the evidence of objective materiality is overwhelming, e.g., valuation of a vessel at sixteen times its purchase price, a trial court may determine on a pre-trial motion that the policy has been voided justifiably). No reasonable juror could conclude, under the facts of this case, that defendants would not have declined to embrace plaintiff's requested thirty million dollar policy had they known of the prior London cancellation and of the incriminating contents of the telex from the London broker—at least not without subsequent opportunity for defendants to make their own investigation and perhaps adjust of the amount insured.

It is not necessary though to resort to common sense for a determination that plaintiff's non-disclosure of the London underwriters' decision was indisputably material. Independent written statements by plaintiff's New York broker prior to defendants' entry into this second Singapore to Piraeus underwriting venture make the materiality of the London telex quite clear. The July 9, 1982 letter to plaintiff from Howland Keller on behalf of Yerkes & Associates sets forth the "underwriting position" of the New York underwriters. Keller focussed on the centrality in the prior Singapore to Marseilles insurance undertaking of the fact that there had been a writing signed by a prospective buyer indicating a thirty million dollar value for plaintiff's collection. This "underwriting position" letter from Keller places it beyond dispute that independent information pertaining to the appraised value of plaintiff's Thai sculpture would be absolutely essential to any decision by the New York underwriters to enter into a second insurance policy for a shipment from Singapore to Greece. A statement by major London insurance companies challenging plaintiff's own appraisal of the Buddhas and fable gods as inflated by possibly one hundred times their true value falls clearly into this category of material information.

Accordingly, faced with the undisputed fact that plaintiff failed to disclose, although he knew of, the London underwriters' cancellation and their stated reasons therefor, and the fact that no reasonable trier of fact could find that this information would not have been material to defendants' decision to take on the risk, this court determines that no genuine issue of material fact remains as to this non-disclosure to preclude a grant of summary judgment. As a matter of law, defendants were within their rights in voiding *ab initio* the insurance policy in question here because plaintiff failed to disclose to them a material fact. Thus, because defendants must prevail against plaintiff in his attempt to collect under the insurance policy, defendants' motion for summary judgment is granted and the case dismissed.