AMERICAN HOME ASSURANCE COMPANY, The Insurance Company of the State of Pennsylvania, National Union Fire Insurance Company of Pittsburgh, Pa., Birmingham Fire Insurance Company of Pennsylvania, AIU Insurance Company, The New Hampshire Insurance Company, American International Insurance Company of Puerto Rico, Commerce and Industry Insurance Company, and Commerce and Industry Insurance Company of Canada, Plaintiffs,

v.

FREMONT INDEMNITY COMPANY, Defendant.

No. 88 Civ. 3394 (RPP).

United States District Court, S.D. New York.

Sept. 19, 1990.

---

OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This is an action by a reinsured ("AIG") against a reinsurance company ("Fremont") on two contracts of reinsurance, or "treaties." Defendant has moved for summary judgment pursuant to Fed.R.Civ.P. 56 rescinding the reinsurance treaties and dismissing the complaint. For the reasons set forth below, defendant's motion is denied.

## BACKGROUND

### 1. First Blanket Treaty

In October 1978, Paul Napolitan, Inc. ("Napolitan"), an affiliate of AIG acting as a reinsurance intermediary, solicited defendant Fremont's participation as a reinsurer of AIG under a proposed reinsurance agreement later termed the First Blanket Casualty Excess of Loss Reinsurance Agreement (the "First Blanket Treaty"). Under the agreement, plaintiff AIG remained liable for the first $1 million of loss for each occurrence in the ceded policies. The First Blanket Treaty provided reinsurance for the next $4 million (the "4 × 1 layer") of covered loss per occurrence in excess of $1 million. However, AIG assumed responsibility for a portion of the losses in the 4 × 1 layer, a practice termed "additional aggregate retention." Thus the reinsurers would not suffer a loss under the treaty until aggregate losses in the 4 × 1 layer exceeded the combination of AIG's aggregate retention and the premium AIG paid to the reinsurers. For the first three years, the First Blanket Treaty provided the reinsurers with such a loss "cushion" ranging from $24.9 million in 1979 to $28.75 million in 1981. Fremont ultimately accepted a 1.5% participation in the First Blanket Treaty, a participation which increased to 4.5% on January 1, 1980.

Prior to the solicitation of Fremont, Napolitan submitted a study to AIG entitled "Reinsurance Survey" (the "Napolitan Report") on June 1, 1978, analyzing various features of the First Blanket Treaty. Roper Aff., Exh. F. The covering letter shows

Cahill Gordon & Reindell, New York City by Edward P. Krugman, for plaintiffs.

Miller, Singer, Raives & Brandes, New York City by Lawrence I. Brandes, for defendant.

that Kenneth Meyer, a Napolitan account executive, performed the analysis reflected in the report. Exhibit G to the Napolitan Report projected aggregate losses in the 4 × 1 layer ranging from $35.22 million in 1979 to $73.081 million in 1983—at all times exceeding the reinsurers' cushion under the terms of the treaty. These projections were not disclosed to Fremont in 1978 as part of the solicitation materials for the First Blanket Treaty, although Fremont did receive the underlying data and loss ratios from which the projections were calculated.

### 2. Blown Max Treaty [1]

In October 1980, Interocean Agency, Inc. ("Interocean"), solicited Fremont's participation as a reinsurer of AIG under the Aggregate Excess Liability Excess of Loss Treaty, or the "Blown Max" Treaty. Under the treaty, the reinsurers had no liability until covered losses on a policy had "blown max," or exceeded the maximum premium. The maximum premium is typically expressed as a percentage (greater than 100) of standard premium, with higher percentages providing the reinsurers with a greater cushion before they are exposed to losses. If maximum premium is only 100% of standard premium, the reinsurers experience losses when covered losses reach an amount equal to the standard premium with no cushion at all. Standard premium on the risks covered by the Blown Max Treaty was $700,000.

Among the solicitation materials sent to Fremont was a letter from Dennis Busti, Executive Vice President of AIG, to Joseph Zaffarese, Senior Vice President of Interocean, representing that AIG's "average maximum premium [was] 165% with our lowest being 120%." Roper Aff., Exh. G, Exh IV thereto. The letter later refers to a "700,000 standard premium." *Id.* Thus, AIG represented to the reinsurers that losses on the ceded policies must exceed a minimum cushion of at least $140,000 (20% of $700,000) above the $700,000 standard premium before the reinsurers' liability attached.

However, an AIG internal memorandum (the "Taranto memorandum") dated August 9, 1984, contained a chart reporting the average maximum premiums, established at the inception of the covered policies, for the years 1978 through 1983. The chart shows that the average maximum premium for the three years prior to the solicitation of Fremont was 120% of standard premium, not 165% as AIG had represented at the time. Roper Aff., Exh. I. As interpreted by Fremont, the difference would expose the reinsurers to additional potential exposure on each covered policy of $315,000.

In addition, AIG policy files contained premium adjustment worksheets relating to certain policies ceded to the Blown Max Treaty showing that the maximum premium had been set at 100% of standard premium, providing no cushion whatsoever and controverting the original representation that the lowest maximum premium was 120% of standard premium. Roper Aff., Exh. K.

Neither of these facts were disclosed to Fremont at the time AIG solicited Fremont's participation in the Blown Max Treaty in 1980. Fremont bases its motion for summary judgment on the foregoing nondisclosures and misrepresentations, which it alleges were material.

### DISCUSSION

To grant a motion for summary judgment a court must find that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law because, after sufficient time for discovery, the non-moving party has failed to make a sufficient showing of an essential element of its case as to which it has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### 1. First Blanket Treaty

 The parties agreed at oral argument that AIG had a duty to disclose to Fremont

---

1. The parties' submissions refer to the second contract of reinsurance as the Blown Max Trea-

ties but, for the purposes of this motion, the agreement will be referred to as a single treaty.

all facts and circumstances known to AIG which materially affected the reinsurers' risk. *See, e.g., Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 870 (2d Cir. 1985). Materiality in this context depends on whether the information "would have controlled the underwriter's decision" to assume the risk. *Id.* at 871 (quoting *Btesh v. Royal Ins. Co.*, 49 F.2d 720, 721 (2d Cir.1931)). The Court finds an issue of fact precluding summary judgment rescinding the First Blanket Treaty in whether or not the loss projections contained in Exhibit G to the Napolitan Report and not disclosed to Fremont were material. The issue of whether a nondisclosure is material so as to entitle an underwriter to void the policy is an issue of fact. *Knight v. U.S. Fire Ins. Co.*, 651 F.Supp. 477, 481 (S.D.N.Y.), *aff'd*, 804 F.2d 9 (2d Cir.1986)

■ Fremont contends that the very fact that the Napolitan Report projected significantly greater losses than expected to the reinsurers makes the projections material. AIG, on the other hand, contends that the projections in Exhibit G represent Kenneth Meyer's personal and subjective views as a non-actuary presented as a sales proposal and do not purport to be actuarial loss estimates of AIG. For example, AIG argues that Meyer failed to observe certain basic actuarial techniques by neglecting to perform on-level premium adjustments and to account for changes in underwriting standards, exposure or loss environment. Sandler Aff. ¶ 17. Meyer also allegedly utilized a loss history too limited to yield credible loss projections on a purely statistical basis. *Id.* Finally, AIG contends that the Meyer loss projections were not material since Fremont was provided with the underlying data and its actuaries were in as good a position, if not better, than was Meyer to calculate predicted losses. Roper Aff., Exh. A at 1309–12.

It remains to be seen whether under the standard by which materiality is judged, an objective one, industry practice would consider the Meyer loss projections as material to a reinsurer's decision to participate in the First Blanket Treaty. *See, e.g., Carlingford Australia Gen. Ins. Ltd. v. St. Paul Fire & Marine Ins. Co.*, No. 86 Civ. 9011, 1989 WL 79393 (S.D.N.Y. July 11, 1989, and Nov. 15, 1989) (LEXIS, Genfed Library, Dist File) (permitting defendant reinsurer to amend answer to claim rescission because plaintiff's failure to disclose expected profit may have been material). Thus, summary judgment rescinding the First Blanket Treaty is denied.

### 2. The Blown Max Treaty

■ Fremont's argument in favor of rescission of the Blown Max Treaty is much the same as that advanced under the First Blanket Treaty. Fremont contends that since AIG allegedly misrepresented the average maximum premium as a percentage of standard premium in such a way as to expose the reinsurers to a potential additional liability of $315,000 per policy of which the reinsurers were unaware, the mere fact of increased risk makes the misrepresentation material.

AIG asserts that the solicitation materials including the Busti letter involved no misrepresentations. Rather, the phrase "Std. Premium" is used in a different sense in the 1984 Taranto memorandum than it was in the original solicitation materials including the Busti letter, rendering a comparison of the type offered by Fremont meaningless. According to AIG, the Blown Max Treaty included two different types of insurance plans for which internal terminology differed. For the first type, traditional "retro" plans, the maximum premium was expressed as a percentage (greater than 100) of the initial, or standard, premium as outsiders like Fremont understood. However, the treaty also included "retention" plans in which the initial premium was called the "pay-in" or "deposit" premium and the maximum premium was called the "standard" premium. Thus the term "standard premium" was not susceptible of a single meaning in the documents on which Fremont relies to establish that a misrepresentation was made.

AIG contends that the representation in the Busti letter that "[o]ur average maximum premium is 165% with our lowest being 120%" was accurate when made

based on AIG actuarial reports showing an average maximum premium factor ranging from 123.4% in 1975 to 183.7% in 1979. Gaillard Aff., Exh. 1, Col. 12. The AIG evidence is sufficient to raise an issue of material fact precluding summary judgment as to whether the representation in the Busti letter was false.

In conclusion, defendant's motion for summary judgment is denied. Counsel are to attend a pretrial conference at 9:00 a.m. on Monday, October 1, 1990, in courtroom 444.

SO ORDERED.