**Albert T. CHANDLER, as the Executor of the Estate of Frederick W.A. Knight, Plaintiff,**

v.

**H.E. YERKES AND ASSOCIATES, INC., and Robert Francis O'Leary, Defendants.**

No. 87 Civ. 0702 (PKL).

United States District Court, S.D. New York.

Feb. 18, 1992.

---

Weg & Meyers, P.C., New York City (Dennis D'Antonio, of counsel), for plaintiff.

Wilson, Elser, Moskowitz, Edelman & Dicker, New York City (Philip J. Walsh, Jonathan C. Thau, John S. Diaconis, Robert P. Exelbert, of counsel), for defendant H.E. Yerkes & Associates, Inc.

## OPINION AND ORDER

LEISURE, District Judge.

In this diversity action, defendant, H.E. Yerkes and Associates, Inc. ("Yerkes"), now moves the Court, pursuant to Fed. R.Civ.P. 56(c), for summary judgment. Plaintiff, Albert T. Chandler ("Chandler"), as executor of the estate of Frederick W.A. Knight ("Knight"), opposes the summary judgment motion, claiming that there exist disputed issues of material fact. For the following reasons, defendant's summary judgment motion is denied.

## BACKGROUND

This lawsuit has its roots in Knight's efforts, between 1976 and 1983, to purchase, insure and ship a collection of 222 Thai Buddha and fable god statues (the "Buddhas"). In 1983, after Knight bought a $30 million insurance policy for the Buddhas from the U.S. Fire Insurance Company ("U.S. Fire"), the Aliakmon Runner, which was carrying the Buddhas, sank in deep waters in the Indian Ocean. However, after the loss, U.S. Fire disclaimed coverage, based on a failure by the insured to disclose that an earlier policy covering the Buddhas, issued by a London insurer, had been cancelled after an appraiser determined the statues to be replicas.

Since then, Knight has been involved in a series of lawsuits, seeking to recover from the insurance carrier, his attorneys and various insurance brokers. These suits have spawned a series of five Opinions, familiarity with which is assumed, which, *inter alia,* dismissed Knight's suits against the insurers and his attorneys, and allowed the substitution of Chandler as plaintiff in the instant action after Knight's death in June 1989. *See Knight v. U.S. Fire Ins. Co.,* 651 F.Supp. 477 (S.D.N.Y.) (*Knight I*) (granting insurer summary judgment motion), *aff'd,* 804 F.2d 9 (2d Cir.1986) (*Knight II*), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Haight, Gardner, Poor & Havens v. Knight,* N.Y.L.J. at 12, col. 1 (Sup.Ct.N.Y.Co. Mar. 8, 1988), *aff'd,* 150 A.D.2d 993, 543 N.Y.S.2d 601 (1st Dept.1989) (dismissing Knight legal malpractice counterclaims); *Knight v. H.E. Yerkes & Assoc., Inc.,* 675 F.Supp. 139 (S.D.N.Y.1987) (dismissing Yerkes third-party complaint); *Knight v. H.E. Yerkes & Assoc., Inc.,* 135 F.R.D. 67 (S.D.N.Y.1991) (granting motion to substitute plaintiff and rejecting motion to dismiss for failure to prosecute). Having failed in his attempts to recover from his insurer and his attorneys, Knight has now brought suit against Yerkes and Robert Francis O'Leary ("O'Leary"), claiming that these insurance brokers failed to procure effective coverage for the Buddhas.

The events leading up to this litigation began between 1976 and 1979, when Knight purchased the Buddhas in Thailand for approximately $65,000. Subsequently, a Thai appraiser hired by Knight valued the Buddhas at $20 million, in 1980, and at $30 million, in 1981. Yerkes, a wholesale insurance broker by trade, first became involved in these transactions in 1980, when he was approached by Knight's broker, O'Leary, concerning procurement of a $20 million policy to cover the Buddhas during a voyage from Singapore to Holland. Yerkes was successful in locating an insurer that was willing to accept the risk, contingent on an inspection of the Buddhas by an expert of its own choosing. However, Knight did not pursue this coverage.

Knight subsequently redirected his efforts towards the European market, where he purchased a $20 million policy from a London insurer to cover the shipment of the Buddhas from Singapore to Holland. In June 1981, however, before a vessel carrying the Buddhas left port, the London insurer received two anonymous calls indicating that " 'Mr. Knight is going to commit a fraud. He will sink the vessel in which his collection is going to be shipped.' " Deposition of Frederick W.A. Knight, taken on May 2–3, 1989 ("Knight Deposition"), at 208. After demanding the right to inspect a random sampling of the Buddhas, and discovering that they were replicas, the London insurer cancelled coverage in 1981.

In 1982, Yerkes was again approached by O'Leary, on Knight's behalf, concerning the purchase of insurance in the United States. Thereafter, Yerkes successfully brokered an insurance contract for $30 million, with U.S. Fire, to cover the Buddhas on a journey from Singapore to Marseilles, and then to Paris. Although this policy lapsed when the Buddhas were not shipped, another $30 million policy was purchased from U.S. Fire in October 1982, for a voyage from Singapore to Piraeus, Greece.

In February 1983, the Aliakmon Runner departed from Singapore, carrying the cargo of Buddhas. Soon thereafter, apparently as the result of a fire and explosion in the ship's engine room, the vessel sank in the Indian Ocean. Although all crew members were picked up safely by another ship, the Buddhas sank with the vessel. After the loss, however, the insurers declined coverage, voiding the policy *ab initio* because of the failure to disclose that the London policy had been cancelled. The denial of coverage for failure to disclose the cancellation was upheld by the Hon. Constance Baker Motley, United States District Judge of this Court, and affirmed on appeal.

After the suits against Knight's insurers and attorneys were dismissed, Knight initiated this action against the insurance brokers. Yerkes now moves for summary judgment, raising four arguments. Yerkes first contends that it did not owe a duty to Knight, because it did not have a brokerage contract with plaintiff and did not act as his insurance broker or agent. Yerkes thus contends that, because it dealt with O'Leary, rather than with Knight, it cannot be held liable to Knight. The next argument raised by Yerkes asserts that this suit must fail because Knight did not rely to his detriment on Yerkes' actions. Rather, claims defendant, Knight would have shipped the Buddhas to Piraeus in 1983 regardless of whether insurance had been procured.

Yerkes' third argument asserts that, even if a duty was owed to Knight, the duty was not breached. The first basis for this argument relies on the claim that the cancellation of the London insurance policy, which was the basis for the disclaimer of coverage after the loss of the Buddhas, was not communicated to Yerkes. In further support of the claim that no duty was breached, Yerkes argues that insurance for the Buddhas could not have been procured, because no insurer would have written an appropriate policy at a reasonable premium. The fourth and final basis for Yerkes' summary judgment motion relies on the principle of equitable estoppel. Here, Yerkes argues that Knight should be equitably estopped from bringing this suit because defendant cooperated with and turned his files over to plaintiff during the course of Knight's earlier, unsuccessful suit against his insurer.

## DISCUSSION

### A. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "Summary judgment is appropriate if, 'after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could

find in favor of the non-moving party.' " *United States v. All Right, Title & Interest in Real Property, etc.*, 901 F.2d 288, 290 (2d Cir.1990) (quoting *Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988)).

Summary judgment may be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the case identifies the material facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." [1] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Herbert Constr. Co. v. Continental Ins. Co.*, 931 F.2d 989, 993 (2d Cir.1991). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there does indeed exist a genuine issue for trial." *Anderson, supra*, 477 U.S. at 249, 106 S.Ct. at 2510; *see also R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 107 (2d Cir.), *cert. denied*, 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). In determining whether there exist disputed issues of material fact, "[t]he court must resolve any ambiguities and draw all inferences against the moving party. Even though both parties … agree that there are no issues of fact, the court may still find that factual issues exist." *Cargill, Inc. v. Charles Kowsky Resources, Inc.*, 949 F.2d 51, 55 (2d Cir.1991).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials it believes "demonstrate the absence of a genuine issue of material fact." *Celotex, supra*, 477 U.S. at 323, 106 S.Ct. at 2552. "[T]he burden on

the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra*, 477 U.S. at 325, 106 S.Ct. at 2554; *see Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir. 1991).

Once a motion for summary judgment is properly made, the burden shifts to the nonmoving party, which " 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson, supra*, 477 U.S. at 250, 106 S.Ct. at 2511 (quoting Fed.R.Civ.P. 56(e)). "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.' " *Delaware & H. Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson, supra*, 477 U.S. at 252, 106 S.Ct. at 2512, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986)), *cert. denied*, — U.S. —, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991).

**B.** *Merits of Yerkes Summary Judgment Motion*

    1. *Duty of Yerkes as Wholesale Broker*

The Court first turns to Yerkes' assertion that it owed no duty to Knight because it was a wholesale broker that did not deal directly with plaintiff. It appears to the Court that the crux of this claim is that Knight was not in privity with Yerkes, and therefore cannot maintain a suit against it. In fact, the principle of privity does limit the rights of parties to maintain suits in the insurance context. *See, e.g., Mercantile & General Reinsurance Co. v. Spanno Corp.*, 151 Misc.2d 311, 573 N.Y.S.2d 102, 104 (Sup.Ct.N.Y.Co.1991) (finding no privity of contract between insured and insurer's reinsurer); *Velastequi*

---

1. As a case concerning a policy of marine insurance, the Court believes that this action should be controlled by federal common law. *See Knight II, supra*, 804 F.2d at 13. However, because Knight and Yerkes both rely on New York law, the Court applies New York law to

this case "[u]nder the principle that implied consent to use the forum's law is sufficient to establish choice of law." *Tehran–Berkeley Civil and Environmental Engineers v. Tippetts–Abbett–McCarthy–Stratton*, 888 F.2d 239, 242 (2d Cir.1989).

*v. Exchange Ins. Co.*, 132 Misc.2d 896, 505 N.Y.S.2d 779, 780–81 (Civ.Ct. Kings Co. 1986) (finding no privity of contract between insured and insurer's adjustor).

However, the purported lack of privity between Knight and Yerkes is not dispositive of the instant action in its current procedural posture. In support of the argument that a wholesale broker owes no duty to the insured, Yerkes relies primarily on *Talking Togs of Broadway v. Mutual Fire and Inland Ins. Co.*, No. 3488/86 (Sup.Ct.N.Y.Co., June 23, 1988), *aff'd*, 149 A.D.2d 993, 540 N.Y.S.2d 400 (1st Dept. 1989) (citing *Moshiko, Inc. v. Seiger & Smith, Inc.*, 137 A.D.2d 170, 529 N.Y.S.2d 284 (1st Dept.), *aff'd*, 72 N.Y.2d 945, 533 N.Y.S.2d 52, 529 N.E.2d 420 (1988)). However, both *Talking Togs* and *Moshiko* turned on the fact that the wholesale broker had merely relayed information to the insurer, which issued a policy that conformed in all respects to the broker's requests. Neither of these cases stands for the proposition that a wholesale insurance broker cannot be held liable for the alleged failure to fully inform an insurer of all the information in its possession.

Moreover, the Court believes that the issue whether Yerkes was acting as an agent for Knight or O'Leary is a question of fact that has not been conclusively resolved on the current record. *Cf. Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620, 624 (2d Cir.1989) (holding principal liable to third party for tort of agent despite lack of privity between principal and third party). Thus, because Yerkes has not demonstrated as a matter of law that there was no contract or agency relationship between Yerkes and Knight that could give rise to liability, the first basis for defendant's summary judgment motion must be rejected.

### 2. *Knight's Lack of Reliance*

■ The next basis for Yerkes' summary judgment motion is the claim that Knight did not rely on Yerkes' procurement of insurance in deciding whether to ship the goods. Rather, claims defendant, Knight would have shipped the Buddhas whether or not insurance coverage was in place. In support of this argument, defendant draws from Knight's deposition testimony, where plaintiff expressed impatience with the progress of attempts to procure coverage for the Buddhas. Specifically, Knight indicated that in July or August of 1981, "[a]t that time I was so fed up with everything I was prepared to have the goods shipped without insurance, which normally I would not have done." Knight Deposition, at 314–15. Defendant thus argues that Knight's loss was not caused by any act or omission by Yerkes.

The Court need not pause long before rejecting this argument. Despite his expression of annoyance at the delay in procuring insurance during the summer of 1981, Knight did not act on this impulse. Rather, Knight waited until insurance coverage was in place before sending the Buddhas on their fateful journey. Moreover, the contention that Knight's mental state in the summer of 1981 is dispositive of his state of mind between October 1982 and February 1983 almost disproves itself.

Yerkes will be free to argue to the jury at trial that Knight's deposition testimony supports an inference that he was intent on dispatching the statues to Europe whether or not insurance coverage was in place. Alternatively, Yerkes may choose to argue that Knight was intent on perpetrating a fraud, and that he would not have shipped the Buddhas without insurance coverage. Regardless of the arguments advanced at trial, however, it is obvious that there is no basis for determining, as a matter of law, that defendant is not liable to plaintiff because Knight did not rely on Yerkes' attempts to procure insurance. *See Rosen v. Spanierman*, 894 F.2d 28, 34–35 (2d Cir. 1990) (reversing grant of summary judgment based on district court finding of no reliance).

### 3. *Breach of Duty by Yerkes*

The Court next turns to the third argument in support of the summary judgment motion, where Yerkes argues that, even if it owed a duty to Knight, that duty was not breached. In examining this argument, the

Court begins by analyzing the duty owed by an insurance broker to its client. Under New York law, a

> broker may be held liable for neglect in failing to procure insurance, with liability limited to that which would have been borne by the insurer had the policy been in force.... The liability, it has been held, may either be based upon breach of contract or tort. However, in order to support a recovery, it must be demonstrated that coverage could have been procured prior to the occurrence of the insured event.

*American Motorists Ins. Co. v. Salvatore,* 102 A.D.2d 342, 476 N.Y.S.2d 897, 900 (1st Dept.1984) (citations omitted); *see Island Cycle Sales, Inc. v. Khlopin,* 126 A.D.2d 516, 510 N.Y.S.2d 637, 639 (2d Dept.1987) ("[a] broker who negligently fails to procure a policy ... stands in the shoes of the insurer"); *Associates Commercial Corp. v. White,* 80 A.D.2d 570, 435 N.Y.S.2d 796, 797 (2d Dept.1981); *MacDonald v. Carpenter & Pelton, Inc.,* 31 A.D.2d 952, 298 N.Y.S.2d 780, 783 (2d Dept.1969); *Royal Ins. Co. of America v. Cathy Daniels, Ltd.,* 684 F.Supp. 786, 792 (S.D.N.Y.1988) (applying New York law); *see also Blonsky v. Allstate Ins. Co.,* 128 Misc.2d 981, 491 N.Y.S.2d 895 (Sup.Ct.N.Y.Co.1985) (finding no breach of duty in broker's failure to ensure absence of gaps in policy coverage).

a. Failure to Disclose Prior Cancellation

In accordance with this body of law, it is clear that a broker's failure to disclose material information to the insurance company is a breach of duty. *See Cathy Daniels, supra,* 684 F.Supp. at 792 ("failure to disclose known facts material to the risk constitutes a breach of [the broker's] duty"). Further, the parties to a contract of marine insurance owe each other the highest duty of good faith, including a requirement that the insured disclose all material information to the insurer. *Knight II, supra,* 804 F.2d at 13 ("the doctrine of *uberrimae fidei....* requires the assured to disclose all known circumstances that materially affect the risk being insured"); *Puritan Ins. Co. v. Eagle*

*S.S. Co. S.A.,* 779 F.2d 866, 870 (2d Cir. 1985).

In light of this comprehensive disclosure obligation, Yerkes asserts that it is not liable to Knight for the disclaimer of coverage because it was not informed that the London policy had been cancelled. Since the failure to communicate this information to U.S. Fire was the sole basis for the disclaimer of coverage by the insurer, and since Yerkes allegedly was ignorant of the earlier cancellation, defendant argues that it cannot be held liable to Knight for failure to disclose the information to the insurer.

In addition to Yerkes' own contention that it was not informed of the prior cancellation by Knight or O'Leary, *see* Yerkes Statement Pursuant to Local Rule 3(g) ¶ 14, defendant also relies on Knight's deposition testimony. As the following questions and answers illustrate, Knight has testified that O'Leary did not disclose the cancellation to Yerkes.

Q. What information did you tell Mr. O'Leary that he did not relate to Mr. Yerkes?

A. All the information pertaining to Lloyds' cancellation in Singapore, in extensive, I told him. I send him the relevant taxes and documents.

. . . .

Q. After the placement that Mr. Yerkes effected, did you ever ask Mr. O'Leary whether he gave all the information you gave him to Mr. Yerkes?

A. I asked him why he didn't pass on all the information and he said he was of the opinion and—that he was still of the same opinion that it wasn't necessary.

Q. Do you know what information Mr. O'Leary did not give to Mr. Yerkes?

A. Well, the fact that the shipment was cancelled by Lloyds'. The shipment from Singapore to Holland comprising the 222 Buddhas and fable gods.

Q. And Mr. O'Leary told you he didn't disclose that fact to Mr. Yerkes?

A. Yes, after the claim had occurred. Knight Deposition, at 74–77.[2]

In response, Knight cites O'Leary's deposition, and argues that "O'Leary is emphatic that he informed Yerkes that London had cancelled the policy and this cancellation served as the basis of O'Leary's and Knight's discussion." Plaintiff's Brief in Opposition to Yerkes Motion for Summary Judgment ("Knight Response"), at 22. Although O'Leary's words are less than emphatic, as the following excerpts demonstrate, O'Leary did state that he told Yerkes that the London policy had been cancelled.

A. There was no reflection on what [Yerkes] had done in the past. It was just something [Knight] wanted to do in London. They said that—at that point they said the value had been insured by London for $30 million. That London had cancelled the policy on terms of arguments about valuation, phone calls, very, very innocuous situations.... We had a long talk about the duty of Leeds brokers, who a Leeds broker represented, whether he represented the insured or the market. We had a long discussion on the question of values, Rembrandts, insurance policies in general. We had a general discussion on replicas.

. . . .

Q. When you told Mr. Yerkes that the London policy had been cancelled, did he respond?

A. Yes, that triggered the question of valuation, the question of a duty of a Leeds broker to his client for his market. The general discussion of [Knight's] problem and that it would seem to be no problem to both of us because Mr. Knight wanted the St. Paul policy reinstated.

He was totally aware that the St. Paul policy had a stipulation to inspect or the quotation was "inspection of the goods,"

and the question would be—the question of value would be established, whatever the value was.

Q. Did he ask you any specifics about the London cancellation?

A. I don't believe so. Other than value and the general discussion of the facts.

. . . .

Q. Now, you testified a moment ago with regard to [the telex informing Knight that the London insurance policy had been cancelled], that you thought at the time you had given that to Mr. Yerkes during your meeting.

A. In my deposition, and why I hesitate on this particular question—in my deposition I stated that I thought that I had provided Harry Yerkes with this document. My problem at the time was that this turned up, this Exhibit 9, turned up in the files....

I may have had a presumption in my mind that Exhibit 8 was also there. If this didn't turn up or if that didn't turn up, frankly, counsel, I couldn't swear to what I—that I gave them all these documents. As I testified, to my knowledge, but if I didn't give him—and I must have given him these two that we discussed because that was the entire reason why I was explaining to Mr. Yerkes why I was back to see him.

Deposition of Robert O'Leary, taken on May 5 & June 13, 1989, at 145–152.

Careful consideration of this evidence reveals that there currently exists a dispute on the material fact whether O'Leary told Yerkes of the cancellation. Whereas Yerkes asserts that it was never informed by O'Leary that the London policy had been cancelled, O'Leary testified that he did tell Yerkes. Although Knight testified that O'Leary did not convey this information, Knight was not present at the meeting where the information allegedly was communicated. Moreover, O'Leary's ina-

---

**2.** Yerkes also attempts to draw support from a report written by Knight's former attorneys. *See* Affidavit of John S. Diaconis, Esq., sworn to on July 3, 1991, Ex. C, at 28–29 (Report from Haight, Gardner, Poor & Havens to Frederick W.A. Knight, dated January 14, 1985). However, the Court believes that the report is inad-

missible hearsay that cannot be considered on this summary judgment motion. *See H. Sand & Co., Inc. v. Airtemp Corp.,* 934 F.2d 450, 454–55 (2d Cir.1991) (improper to consider inadmissible hearsay on summary judgment motion); Fed.R.Evid. 801(c), 805.

bility to recall whether he turned the telex over to Yerkes is not dispositive of the issue whether there was a discussion concerning the cancellation. Given the current record, the Court finds that there exists a disputed issue of material fact concerning communication of the prior cancellation to Yerkes. Thus, although the weight of the evidence points to the conclusion that Yerkes was not informed of the cancellation, the existence of a factual dispute on this issue precludes a grant of summary judgment.

Given the history of this litigation, the Court also takes this opportunity to warn the various parties to this action against relying on perjured testimony in an attempt to prevail at trial. "Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings. Effective restraints against this type of egregious offense are therefore imperative." *United States v. Mandujano*, 425 U.S. 564, 576, 96 S.Ct. 1768, 1776, 48 L.Ed.2d 212 (1976) (Burger, C.J.); *see also United States v. Jacobs*, 547 F.2d 772, 775 (2d Cir.1976) ("We abhor perjury ..."), *cert. dismissed*, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978); 18 U.S.C. § 1621 (five years imprisonment and/or $2,000 fine upon conviction for perjury).[3]

b. Availability of Insurance Coverage

■ Yerkes also argues that it did not breach any duty that was owed to Knight because procurement of effective coverage for the Buddhas was impossible in light of the cancellation of the London policy. In support of this position, Yerkes refers to the decisions in *Knight I* and *Knight II* and claims that they mandate a finding that Knight "will not be able to demonstrate at trial that *any* reasonable insurer would have provided insurance coverage in the amount of $30 million for the Thai statuary." Memorandum of Law in Support of Motion for Summary Judgment of Defendant H.E. Yerkes and Associates, Inc. ("Yerkes Motion"), at 23.

To support his position, Yerkes quotes Judge Motley's conclusion, which was adopted by the Second Circuit, that

> [n]o reasonable juror could conclude, under the facts of this case, that defendants would not have declined to embrace plaintiff's requested thirty million dollar policy had they known of the prior London cancellation and of the incriminating contents of the telex from the London broker ...

*Knight II, supra,* 804 F.2d at 13 (quoting *Knight I, supra,* 651 F.Supp. at 483). However, in drawing from these Opinions, Yerkes omits relevant language which casts the quotation in a different light. Thus, Judge Motley finished her sentence with the observation that coverage would not have been provided, "at least not without subsequent opportunity for [the insurers] to make their own investigation and perhaps adjust ... the amount insured." *Id.* Similarly, the Second Circuit observed that a reasonable insurer "would not take on the risk or maintain the same premium without at least investigating the prior cancellation, if informed of it and the stated reasons therefor." *Id.*

It is thus beyond cavil that there has been no finding that the coverage sought by Knight was unavailable. In fact, while Knight has produced affidavits of insurance experts indicating that coverage could have been procured despite the prior cancellation, Yerkes has provided absolutely no legal or factual support for its claim that coverage was unavailable as a matter of law. *Compare* Knight Response, Ex. A–C (affidavits of insurance experts) *with* Reply Memorandum of Law in Further Support of Motion for Summary Judgment of defendant H.E. Yerkes and Associates, Inc., at 19–22.

■ Although Yerkes argues that the Court should not consider the affidavits supplied by Knight, because the affiants do not qualify as experts and do not have personal knowledge of the case, these arguments must be rejected. Fed.R.Civ.P.

---

**3.** Nor should the parties underestimate the power of the Court to impose sanctions where inappropriate conduct has been established by the

record. *See United States v. International Bhd. of Teamsters,* 948 F.2d 1338, 1343–46 (2d Cir. 1991).

56(e) requires that "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *See Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir.1988) (affidavit must be based on personal knowledge). Thus, "[a]ffidavits of an expert submitted on a motion for summary judgment ... should show knowledge of the opposing contentions of fact developed during discovery and deal with those contentions." *Granoff v. Merrill Lynch & Co.*, 775 F.Supp. 621, 628 (S.D.N.Y.1991); *see Dardaganis v. Grace Capital Inc.*, 889 F.2d 1237, 1240 (2d Cir. 1989) (relying on experts' affidavits); *International Salt Co. v. Geostow*, 878 F.2d 570, 575 (2d Cir.1989) (same).

In the case at bar, it is clear that the challenged affidavits can be considered by the Court. The experts that have provided affidavits in support of Knight's motion have read Yerkes' briefs and are familiar with the case. Moreover, the Court finds that the affiants have sufficient "knowledge, skill, experience, training, or education" to be qualified as experts for the purposes of this motion. *See* Fed.R.Evid. 702. Considering these affidavits, the Court finds that there exists a disputed issue of fact concerning the availability of insurance for the Buddhas.

■ Before proceeding, however, the Court pauses to stress that an insurance broker's liability for breach of the duty to procure effective insurance is limited to the amount of coverage that would have been provided by the insurer. *See Island Cycle Sales, supra*, 510 N.Y.S.2d at 639; *American Motorists, supra*, 476 N.Y.S.2d at 900. Thus, were a jury to find that Yerkes agreed to procure insurance for Knight, that O'Leary communicated the cancellation of the London policy to Yerkes and that some form of insurance coverage was available, it is altogether possible that the recovery for Knight's loss will be limited to $65,000—the initial purchase price of the Buddhas.

### 4. *Equitable Estoppel*

■ The Court next turns to consider Yerkes' assertion that Knight's action should be dismissed under the doctrine of equitable estoppel. Defendant asserts that plaintiff should be equitably estopped from pursuing this action because "Yerkes willingly acquiesced to Knight's request for assistance in [Knight's] action against his insurers, without reasonable apprehension that Knight would claim in a later action that the insurers were unaware of the prior cancellation of coverage." Yerkes Motion, at 34.

Under New York law, the doctrine of equitable estoppel provides " 'that where one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must suffer it.' " *Bunge Corp. v. Manufacturers Hanover Trust Co.*, 31 N.Y.2d 223, 228, 335 N.Y.S.2d 412, 415, 286 N.E.2d 903 (1972) (quoting *National Safe Deposit Savings & Trust Co. v. Hibbs*, 229 U.S. 391, 394, 33 S.Ct. 818, 819, 57 L.Ed. 1241 (1913)). "Characteristically, the doctrine is invoked successfully against a party who has occasioned a loss through an obvious lack of care or an affirmative act fairly identified as the cause of the loss." *Societe Generale v. Federal Ins. Co.*, 856 F.2d 461, 466–67 (2d Cir.1988) (citing cases).

Asserting that equitable estoppel is "a special tool to do justice in individual cases," Yerkes calls upon the Court to apply the doctrine to the facts of the instant case. Yerkes Motion, at 33; *see also Ayer v. Board of Education*, 69 Misc.2d 696, 330 N.Y.S.2d 465, 468 (Sup.Ct. Monroe Co.1972) (" 'An equitable estoppel rests largely on the facts and circumstances of the particular case; consequently any attempted definition usually amounts to no more than a declaration under those facts and circumstances.' " (quoting 21 N.Y.Jur., Estoppel, Ratification and Waiver § 15)); *Kaneb Servs., Inc. v. Federal Sav. and Loan Ins. Corp.*, 650 F.2d 78, 82 n. 11 (5th Cir.1981) ("The doctrine of estoppel is based on fair dealing and good conscience and prohibits the assertion of a position that would be contrary to equity for a party to allege.").

However, Yerkes' argument must fail. To prevail on an equitable estoppel argument, the movant must establish that it has detrimentally relied on a representation by the party being estopped, suffering injury. *See Triple Cities Constr. Co. v. Maryland Casualty Co.*, 4 N.Y.2d 443, 176 N.Y.S.2d 292, 295, 151 N.E.2d 856 (1958); *Travelers Indemnity Co. v. Swanson*, 662 F.2d 1098, 1101 (5th Cir.1981). Nevertheless, no injury has been shown in the instant case. Yerkes alleges that it gave Knight access to its files and submitted to a deposition in reliance on Knight's stance in the U.S. Fire litigation. However, there has been no claim that Yerkes could have avoided being deposed in this action or that the information turned over to Knight was privileged. Moreover, Yerkes has not alleged that any information from its files or from the deposition is being used improperly to its detriment in the instant action. In the absence of any legal support for the proposition that being the subject of a lawsuit is an injury sufficient to raise the bar of equitable estoppel, Yerkes' argument must be rejected.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is denied. The parties are hereby ordered to appear, on March 20, 1992, at 11:30 A.M., for a pretrial conference in Courtroom 36, United States Courthouse, New York, New York.

SO ORDERED.